# EXHIBIT 43

# Re: Christina M. McLaughlin FERPA Complaint

FERPA.Complaints <FERPA.Complaints@ed.gov>

Fri 3/30/2018 4:39 PM

To:Diana McLaughlin <dianamclaughlin@dianamclaughlin.com>;

1 attachment

EComplaint form FERPAv2018.pdf;

Ms. McLaughlin,

I'm writing on behalf of Dale King, Director, in response to your March 15, 2018, letter addressed to the Family Policy Compliance Office (FPCO) on behalf of Christina McLaughlin (Student).  Prior to this correspondence, this Office had no record of receiving prior correspondence from you or the Student.  In reviewing the March letter, it appears that one copy of the letter was sent to the Department, albeit with multiple offices identified as addressees.  Please note that the address listed for Secretary DeVos as the address of Department of Education, appears to be an address for the state of Virginia government offices.  To that end, as the Office for Civil Rights (OCR) was the first Department office listed, the correspondence was forwarded to OCR and subsequently forwarded to their Atlanta regional office for processing.  Since receiving your March 15, 2018, letter we are working with that office to get a copy of the supporting documents included with the original letter.  That said, section 2 of the attached eComplaint form on page 2 states that "an attorney or advocate may file a complaint on behalf of a parent or an eligible student; however, FPCO will not discuss the complaint with the attorney or advocate without the prior, written consent of the parent or eligible student, as applicable."  Your March 15, 2018 letter does not include such consent, and accordingly this Office will not be able to provide updates to you regarding this complaint absent that consent. Further, it is incumbent upon the complainant, in this case the Student, to only include the relevant facts that would give reasonable cause to believe that a violation of FERPA has occurred.  In addition, section 5 of the attached eCompliant form states the submission of nonessential, voluminous, or nonresponsive information may, among other things, delay the processing, or result in the dismissal or return, of your complaint.  Therefore, we would request that the Student complete the attached eComplaint form per the directions clearly outlining the alleged FERPA violations.  For this Office to further process the complaint and be able to respond directly to you, please forward a signed consent from the Student that permits this Office to discuss the specifics of her complaint, as well as the completed eComplaint form, to my attention at

FERPA.Complaints@ed.gov referencing tracking number 18-0184 in the subject line, within two weeks of the date of this email.

Thank you in advance,

Frank E. Miller Jr.
Deputy Director
Family Policy Compliance Office
U.S. Department of Education
400 Maryland Ave, SW
Washington, D.C. 20202-8520
https://studentprivacy.ed.gov/

# EXHIBIT 44

2336 Immokalee Road
Naples, FL 34110
Phone:  239.229.8481
Fax:  239.449.3397
Email: drdiana@dianamclaughlin.com



Diana **M.D.**
McLaughlin **M.B.A.**
**Esq.**

*Medicine • Business • Law*

April 17, 2018

Elizabeth D. Devos,
U.S. Secretary of Education
Department of Education Bldg.
400 Maryland Ave., SW
Washington, D.C.      20202-1100

**Sent Via United States Postal Service Certified Mail 7012 2210 0001 4777 8728**

      Re:  Family Policy Compliance Office Complaint 18-0184

Dear Secretary Devos,

      I am an attorney representing the interests of law student, Ms. Christina McLaughlin, in all matters concerning violations of Family Education Rights and Privacy Act (FERPA) 20 U.S.C. 1232g committed by Florida International University School of Law against my client. We are filing a formal complaint against the Department of Education, Family Policy Compliance Office for failing to timely process and investigate her FERPA complaint.  The Deptartment of Education was in receipt of the complaint on December 4, 2017 and did not accept or process her complaint until after March 15, 2018.  FPCO is required to at least acknowledge receipt of the complaint within 2 to 3 business days.  FPCO failed to process her complaint for more than 100 days and only as a response to a demand letter.

      We allege that FIU (main university), FIU School of Law and its professors were motivated by personal animus towards Ms. McLaughlin because she is a conservative, Trump supporter that actively participated in several successful 2016 Republican campaigns.  Since President Trump's election, FIU displayed vitriol and severe bias against Republicans and supporters of President Trump throughout the campus and in the classroom.  We allege that FIU intentionally violated Ms. McLaughlin's rights under FERPA to prevent her from ever becoming an attorney that would later become an effective voice in support of a conservative agenda.

The basis of Ms. McLaughlin's FERPA complaint is the following:

1.      Complaint Regarding Access: FIU Law failed to provide timely access to her FERPA records.  The facts clearly demonstrate that FIU Law delivered a third batch of FERPA records

more than 60 days from request and only in response to multiple requests in violation of 20 U.S.C. s. 1232 (g)(1)(A)(2011).

2.      Complaint regarding Access: FIU Law failed to provide all of Ms. McLaughlin's FERPA records.  Ms. McLaughlin disputes that all records were provided and FIU Law has admitted that they are no longer in possession of some FERPA records in violation of 20 U.S.C. s. 1232 (g)(1)(A)(2011).

3.      Complaint Regarding Amendment:  FIU Law failed to comply with a request for a FERPA hearing and failed to follow a process that would have allowed Ms. McLaughlin to amend inaccurate information of her education records in violation of 20 U.S.C. 1232(f) and 20 U.S.C. 1232(g).

4.      Complaint Regarding Failure with Annual Notification of Rights:  FIU School of Law does not provide any notification of FERPA to students attending the law school in violation of 34 C.F.R. 99.7(a)(3)(iii).  The School of Law does not make any mention of rights under FERPA in any way at all.  If FIU (not the law school) publishes notification of FERPA rights on their website, we allege that it is insufficient notice to the students at the School of Law.  FIU School of Law functions as a separate entity and does not refer students to FIU's website.

We allege that the Department of Education intentionally misdirected Ms. McLaughlin's complaint because a conservative student's rights are not worthy of protecting or enforcing.  On November 24, 2017, Ms. McLaughlin properly filed a complaint in writing with all relevant documentation to both the FPCO and the OCR in her own words.  On March 30, 2018, Mr. Frank E. Miller, Deputy Director, admitted that the Department of Education mishandled her complaint by forwarding the complaint to the OCR but not the FPCO.  Mr. Miller did not offer any apologies.  Instead, the tone of Mr. Miller's response was accusatory and blamed the student for the Department's error.  Additionally, Mr. Miller did not expedite processing and has seen slow to obtain all the supportive documents from the OCR.  Mr. Miller also imposed an arbitrary two week deadline to respond to his email for additional forms not statutorily required.

Additionally, the complaint forwarded to the OCR was not acknowledged for more than 60 days.  The staff and attorneys at the OCR (Ms. Cerrone Lockett, Esq., Ms. Andrea de Vries, Attorney and Mr. Timothy Johnson) knew or should have known that Ms. McLaughlin's complaint was not being investigated by the FPCO and did nothing about it.  In fact, on March 13, 2018, Ms. Lockett specifically told me that she had no knowledge of the FPCO or any other part of the Department of Education.  In response to our plea for help from Ms. Lockett to please get information as to what happed to the FPCO complaints, Ms. Lockett stated that she could not help because she had no contacts or no computer access to any other part of the Department of Education and refused further assistance.  Additionally, we left two messages on FPCO voicemails using the main telephone number on the website and received no response.

We allege that all of the above facts and the appalling handling of Ms. McLaughlin's FERPA complaint is not a coincidence or a confluence of detrimental circumstances. We allege that the Department of Education purposely mishandled her complaint and sent it only to the OCR with full knowledge that the OCR would likely terminate the investigation for lack of jurisdiction. The deep state, anti-Trump, anti-conservative bureaucrats in the Department of Education hoped that the 21 year old student would get discouraged and lack the knowledge or stamina to survive a bureaucratic run-around. We allege that the Department of Education and FPCO had no intention of properly and vigorously enforcing FERPA on behalf of a conservative student.

All of the above statement are made in good faith and are based in fact. We respectfully request that the Department of Education commence an internal investigation as to the above stated allegations. Please, respond by April 30, 2018, to confirm receipt of this communication and the Department's intended actions. Thank you for your attention.

Please, see attached documents:

1.      Demand letter – March 15, 2018.

2.      Mr. Miller's email response- March 30, 2018.

3.      Response to Mr. Miller's email- April 15, 2018.

4.      Original complaint November 24, 2017.

Sincerely,

DIANA MCLAUGHLIN, M.D., M.B.A., Esq.
Florida Bar Number:  84479
2336 Immokalee Road
Naples, FL  34110
Phone: (239) 229-8481
Fax:   (239) 449-3397
Email: drdiana@dianamclaughlin.com

# EXHIBIT 45

**2336 Immokalee Road**
**Naples, FL 34110**
**Phone:  239.229.8481**
**Fax:  239.449.3397**
**Email: drdiana@dianamclaughlin.com**



**Diana** **M.D.**
**McLaughlin** **M.B.A.**
**Esq.**

*Medicine • Business • Law*

October 18, 2018

Elizabeth D. Devos,
U.S. Secretary of Education
Department of Education Bldg.
400 Maryland Ave., SW
Washington, D.C.  20202-1100

**Sent Via United States Postal Service Certified Mail**

> Re:  FPCO Complaint 18-0184
>      FPCO Complaint 2067

Dear Madam Secretary,

This correspondence serves as a formal complaint regarding the Family Policy Compliance Office and specifically, Mr. Dale King, Director.  On April 17, 2018, I wrote you regarding mishandling of the above-referenced complaint.  The Family Policy Compliance Office (FPCO) has since opened an investigation.  However, we have yet to have a determination for more than **320 days since the initial complaint was filed**.  All of the FPCO communications with the student/complainant have been adversarial and unhelpful.  Contrastingly, the FPCO has assisted the educational institution with their defenses.  Ms. McLaughlin asserts that this bias is based, at least in part, on animus towards conservative, Trump supporting students.  For the above reasons, Ms. McLaughlin continues to allege that the FPCO has bias against Ms. McLaughlin and that she is unlikely to receive a fair and neutral determination.

The FPCO has violated the Family Education Rights and Privacy Act (FERPA) 20 U.S.C. 1232g and 34 CFR 99 in the following manner:

1. **The FPCO has violated rule 34 CFR 99.65**:  The FPCO substantially exceeded its rule delineating the content of the notice of investigation.  On May 29, 2018, the FPCO, through its director, Mr. Dale King provided FIU a complete blueprint of possible defenses against Ms. McLaughlin, the student/complainant's, allegations.  The FPCO is only permitted to include the substance of the allegation and direct the university to submit a written response.  See 34 CFR 99.65(a)(1) and 34 CFR 99.65 (a)(2).  The FPCO provided FIU with detailed justifications and defenses including citations for each of Ms. McLaughlin's complaints.  The rule 34 CFR 99.65 makes no reference whatsoever about providing an educational institution a full set of arguments and defenses against the students complaint.  The FPCO's act of

providing FIU a full set of defenses is a rule-making act without providing proper notice or rule-making procedure.  There is no statement anywhere in the Act or the rules or the Joint Statement in Explanation of Buckley/Pell Amendment that supports Mr. King's decision to provide FIU with full defenses.  The FPCO statutory duty is to the student/complainant not the university.  The FPCO should not be permitted to favor the university by providing defenses and justification disguised as providing information.  The FPCO has not provided Ms. McLaughlin with any support or information as discussed below.  The FPCO's blueprint of defenses was so effective that FIU availed itself of the FPCO's justification and defenses by quoting the notice of investigation extensively.  In fact, FIU quoted the notice of investigation in its answer, more than five times and used three large block quotes.

2. **The FPCO has perpetrated a fraud of omission by failing to fully disclose the full legislative opinion statement concerning FERPA's scope and intent:**  The FPCO purposefully withheld portions of the "Joint Statement in Explanation of Buckley/Pell Amendment Vol 120 Page 39862 through 39866" in order to favor FIU in their notice of investigation.  The FPCO cherry-picked one sentence of the "Joint Statement" and failed to disclose the entirety of the statement on grades and university's substantive decisions.  The FPCO provided FIU the following statement that the amendment was "not intended to overturn established standards and procedures for the challenge of substantive decisions made by educational decisions made by an educational institution."  Thus, FPCO argued, on FIU's behalf, that FERPA does not apply to any dispute concerning grades.  The FPCO failed to provide the next sentence in the Joint Statement.  The complete Joint Statement quote is that:

> "It is not intended to overturn established standards and procedures for the challenge of substantive decisions made by educational decisions made by an educational institution**. It is intended, however, to open the bases on which decisions are made to more scrutiny by the students, or their parent about whom decisions are being made, and to give them an opportunity to challenge and to correct- or at least enter an explanatory statement- inaccurate, misleading or inappropriate information about which may contribute to an important decision made about them by the institution**." Emphasis added. Page 39862.

The Joint Statement further states,

> "There has been much concern about that the right to a hearing will permit a parent or a student to contest the grade given the student's performance in a course.  That is not intended. **It is intended only that there be procedures to challenge the accuracy of institutional records which record the grade which was actually given.  Thus, the parents or student could seek to correct an improperly recorded grade**, but

could not through the hearing required pursuant to this law contest whether the teacher could have assigned a higher grade because the parent or student believes that the student was entitled to the higher grade." (Emphasis added).  Page 39862.

The FPCO, through Mr. King, states that "evaluations and other records related to a student's performance, upon which a grade is based, would be subject to the FERPA amendment procedure if they contain inaccurately recorded information, such as a wrong date or misspelled name."  As stated above, the Joint Statement clarifies that the manner in which grades are calculated and recorded are subject to FERPA.  The Joint Statement does not limit student record inaccuracies to a "wrong date and misspelled name." In fact, the Joint Statement intends FERPA to give broad rights to students concerning "important decisions" such as dismissals.  The FPCO has trivialized FERPA and the Joint Statement to enforce only minor scrivener's errors.  Ms. McLaughlin has alleged that her law school final grades were inaccurate and misleading because several law school professors' inaccurately calculated her multiple choice raw score exam results, fraudulently failed to give credit for completed assignments and improperly recorded her final grades.  FIU also used non-academic criteria in grading.  The FPCO intentionally omitted those important statements from the "Joint Statement" and effectively placed a thumb on the scale of this investigation, favoring FIU to the detriment of the student/complainant.  The FPCO's omission of the Joint Statement's entire text is effectively re-writing the rules as to FERPA's scope of authority concerning the accuracy of grades.

3. **The FPCO has failed to review Ms. McLaughlin's complaint thoroughly and may have misplaced or destroyed all her documentation:**  The FPCO mischaracterized Ms. McLaughlin's complaints by referring to her request to review her educational records as a "blanket" request.  The FPCO's reference to the student's "blanket requests" is a non-sequitur because Ms. McLaughlin made more than two very detailed requests to FIU. From the start, Ms. McLaughlin provided the FPCO with indisputable correspondence demonstrating that Ms. McLaughlin made a least two very specific educational records requests with detailed lists. All educational records requested were directly related to Ms. McLaughlin and avoided any records specifically excluded by the rules.  The complaint provided indisputable evidence that FIU admits to failing to provide some FERPA education records more than 45 days from receipt of request to review those records in violation of 34 CFR 9910(b).  Ms. McLaughlin has demonstrated that FIU ***effectively prevented*** her from obtaining educational records directly related to Ms. McLaughlin.  The FPCO failed to mention any of those facts in their notice of investigation.  The FPCO failed to mention or take note that FERPA vests rights in the student/complainant, not the educational institution.  The FPCO has repeatedly shown a very superficial and cursory knowledge of Ms. McLaughlin's complaint.  Ms. McLaughlin has inquired several times whether the FPCO is in possession of all the documents (over 400 pages of emails, correspondence and educational records) sent to them, but has

never received an acknowledgement that the FPCO is in possession of Ms. McLaughlin's full complaint.  It is possible that the Department of Education has misplaced or possibly destroyed her complaint at the OCR or elsewhere.  Ms. McLaughlin demands that FPCO clearly inform us whether they are in possession of the original complaint and all the documentation.  Ms. McLaughlin alleges that the FPCO has not made a thorough review of all the documentation provided because the FPCO has predetermined the outcome of this investigation in favor of the educational institution.

4. **The FPCO failed to offer Ms. McLaughlin any guidance or information during the complaint process and repeatedly delayed and stonewalled this investigation:**  Ms. McLaughlin has been forced to navigate the FERPA complaint process against a major university on her own with impediments and delays placed in her path by the FPCO.  Contrastingly, the FPCO has assisted FIU in their defense.  The FPCO has repeatedly stonewalled Ms. McLaughlin's complaint at every step causing her irreparable harm.  The FPCO has not made a determination on Ms. McLaughlin's complaint for more than ten months.  The Department of Education received Ms. McLaughlin's complaint on December 4, 2017.  The FPCO received FIU's Answer on or about July 11, 2018, but did not keep us informed for another six weeks.  The FPCO added another six weeks delay to an already ten month delay.  Only in response to a demand letter, did the FPCO forward FIU's answer on September 7, 2018.  The FPCO's excuse of "limited resources" is insufficient and likely a pretext to cover-up bias in favor of FIU and against a student/complainant.  The FPCO has admitted mishandling Ms. McLaughlin's complaint from the outset.  The FPCO did not even give this complaint a number for more than three months.  The FPCO continues to delay this complaint at every subsequent step.  The FPCO should have expedited this investigation in light of the original mishandling.  The FPCO has not taken any mitigating action for the excessive delay of the student's complaint.

In sum, the FPCO has failed to conduct itself with the proper legislative intent to protect and inform the student consumer of their rights under FERPA.  The FPCO has taken several actions to the detriment of the student.  Alternatively, the FPCO has taken several actions to protect and support the educational institution.  The FPCO, through its Director, Mr. Dale King, has gone rogue and created new rules and standards without following proper rule-making procedure.  The FPCO has abdicated its statutory mandate.

We respectfully request that the Department of Education commence an investigation as to the handling of Ms. McLaughlin's complaint.  Please, let us know whether or not the Department of Education chooses to take any action within four weeks from receipt of this correspondence.

Sincerely,

DIANA MCLAUGHLIN, M.D., M.B.A., Esq.
Florida Bar Number:  84479
2336 Immokalee Road
Naples, FL  34110
Phone: (239) 229-8481
Fax:  (239) 449-3397
Email: drdiana@dianamclaughlin.com



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

September 7, 2018

Diana McLaughlin
2336 Immokalee Road
Naples, FL 34100

Dear Ms. McLaughlin:

This letter is in response to your August 29, 2018, letter to this Office received via electronic mail on August 30, 2018, in which you again express concerns with the Department's handling of the complaint filed by your client, Christina McLaughlin, with the Family Policy Compliance Office (FPCO, or Office). Further, in discussing these concerns, the letter includes requests for specific assurances regarding our investigative process and copies of correspondence between this Office and the Florida International University School of Law (Institution). Again, we extend our apologies on behalf of this Office in regards to the processing of this complaint. Please note that any delay in processing your complaint is not based on a lack of priority of your allegations, but rather a result of limited resources.

This Office's enforcement process is intended to work cooperatively with educational agencies and institutions to achieve their voluntary compliance with FERPA's requirements. To that end, our investigative process follows the requirements as delineated at 34 CFR §§99.60 - §99.67. Based upon FERPA's enforcement provisions, this Office investigates timely complaints containing sufficient allegation of fact that would lead us to believe that a violation of FERPA may have occurred. In reaching this determination, FPCO reviews the information provided by the parent or eligible student, and considers all relevant statutory and regulatory requirements and the Department's interpretation of those requirements, when reaching a decision as to whether there are sufficient facts of a potential violation of FERPA that supports our conducting a formal investigation. If we determine that an investigation is warranted, we initiate an administrative investigation by sending the school and the complainant a notification letter about the allegation. As required, this written notice includes: (1) the substance of the allegations against the educational agency or institution, other recipient, or third party; and (2) directs the agency or institution, other recipient, or third party to submit a written response and other relevant information, as set forth in §99.62, within a specified period of time, including information about its policies and practices regarding education records.

Upon receipt of the educational agency or institution's response, this Office reviews the complaint, if any, information submitted by the educational agency or institution and any other relevant information. As stated at §99.66, the Office may permit the parties to submit further written or oral arguments or information. As a routine practice, we do not request subsequent information from the complainant unless needed for this Office to reach a determination, or

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Ms. Diana McLaughlin

forward copies of the educational agency or institution's written response unless requested.  At the conclusion of our investigation, we then provide to the complainant and the educational agency or institution, a written notice of our findings and the basis for those findings.  Where the educational agency or institution, is found to have not complied with FERPA, that written notice must include:  (1) a statement of the specific steps that the agency or institution or other recipient must take to comply; and (2) provide a reasonable period of time, given all of the circumstances of the case, for the educational agency or institution or other recipient to comply voluntarily.  We close the investigation when voluntary compliance is achieved.  There is no basis under FERPA to require that an educational agency or institution  take punitive or disciplinary action against an individual school official as the result of a FERPA violation.  Further, no private right of action exists under FERPA and FPCO's decisions are final and not subject to appeal.

We are currently reviewing the Institution's written response to our initiation letter.  As requested, we are forwarding you a copy of that response.  Please note that this response is the only correspondence, not including an email notifying us of  the anticipated submission date, this Office has received from the Institution relative to this investigation, and was received in response to our letter dated May 29, 2018, which is the only correspondence, not including an auto-reply confirmation email, from our Office to the Institution.  We have not included a copy of that letter, as you were provided a copy initially and reference the content in your letter.  As stated above, and as referenced at §99.66, we would like to take this opportunity to permit you to submit further written arguments or other information after reviewing the Institution's response.  We will consider that information in making our final determination.  Accordingly, so we may move forward, we ask that you provide this Office with that information within four weeks after you receive this letter.  Please reference complaint number in your correspondence and either submit it electronically at FERPA.Complaints@ed.gov or send it to FPCO at the following address:

> Family Policy Compliance Office
> U.S. Department of Education
> 400 Maryland Avenue, SW
> Washington, D.C. 20202 - 8520

Thank you for your patience and understanding.

Sincerely,

Dale King
Director
Family Policy Compliance



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

May 29, 2018

Mr. Mark Rosenburg
President
Florida International University
11200 SW 8th Street - Rafael Diaz Balart Hall
Miami, Florida 33199

Complaint No. 2067
Family Educational Rights
and Privacy Act

Dear Mr. Rosenburg:

Ms. Diana McLaughlin (Attorney) has filed a complaint on behalf of her client Ms. Christina McLaughlin (Student) with the Family Policy Compliance Office (Office) alleging that Florida International University College of Law (Institution) violated rights afforded students by the Family Educational Rights and Privacy Act (FERPA). The Student has provided this Office with consent authorizing Ms. Diana McLaughlin to represent her with regard to this FERPA complaint. This Office, under authority of § 99.60 of the FERPA regulations, investigates complaints in accordance with the procedures outlined in § 99.65. *See* https://www.ecfr.gov/cgi-bin/text-idx?rgn=div5&node=34:1.1.1.1.33. The section states, in summary:

- The Office will notify the complainant and the institution against which the violation has been alleged, in writing, if it initiates an investigation of a complaint.

- The notification to the institution under this section shall include the substance of the alleged violation and shall ask the institution to submit a written response to the complaint.

This letter serves to notify you of the allegation and to provide you the opportunity to submit a written response. On December 4, 2017, the Department received a complaint alleging that the Institution violated the FERPA regulations.

Allegation 1:

The Student through Counsel alleges that the Institution violated § 99.7 of the FERPA regulations when it failed to annually notify students of their rights, including rights of the Student, as required by FERPA and states:

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-4500
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global
competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Mr. Mark Rosenburg

>...[The Institution] failed to provide any notification of rights under FERPA to students attending the law school in violation of 34 C.F.R. 99.7(a)(3)(iii). In Fall Semester 2016, law students were not provided any notification of FERPA rights. [The Institution] makes no mention of FERPA in any manner. [The Institution] publishes nothing about FERPA on their website. [The Institution] does not send any FERPA notification emails to law students. No mention of rights under FERPA is made in the [Institution]'s *Academic Policies and Regulations*. If FIU, the undergraduate school (not the law school), publishes notification of FERPA rights on the undergraduate website, we allege that it is insufficient notice to the students at the [Institution]. [The Institution] functions as a separate entity and does not refer students to FIU website. Contrastingly, FIU School of Medicine publishes a procedure and a form to submit complaints under FERPA on the medical school website. [The Institution] has a statutory duty to affirmatively and clearly publish FERPA compliant procedure to review, dispute, and hold a hearing and amend FERPA records. [The Institution] violates FERPA notification statutory requirement.

Under § 99.7 of the FERPA regulations, educational agencies and institutions must annually notify students of their rights. In this regard, schools are required to notify students of the right to inspect and review the student's education records and the procedure to do so; the right to seek amendment of records the student believes are inaccurate and the procedure to do so; and the right to consent to disclosures of education records except to the extent FERPA authorizes disclosure without consent. The notification must also inform students of their right to file a complaint with this Office and it must include a specification of criteria for determining who are school officials and what constitutes a legitimate educational interest in education records. A school is not required to notify students individually, but rather is required to provide the notice by any means that are reasonably likely to inform students of their rights. These means could include publication in the school activities calendar, newsletter, student handbook or website.

Allegation 2:

Student through Counsel alleges that the Institution violated § Section 99.10(a) and (b) of the FERPA regulations when it denied the Student access to the student's education records within 45 days in response to the Student's requests, and states:

>[The Institution] failed to provide timely access to her FERPA records in violation of 20 U.S.C. s.1232 (g)(1)(A)(2011). FERPA requires universities to provide all education records within 45 days. The facts clearly demonstrate that [the Institution] delivered a fourth attempt of a incomplete FERPA records release more than 60 days from request and only in response to multiple requests. [The Student] requested all of her student records on June 8, 2017. [The Instituion] claimed to have finished sending all the student records in their possession on August 5, 2017 or more than 45 days. [The Instituion] is in strict violation of FERPA access to education records on its face. Additionally, [the Instituion] did not act in good faith to provide student records. [The Student] requested her

Page 3 – Mr. Mark Rosenburg

> student records on June 8, …June 16, …July 18, …July 22, 2017, and again on July 31, 2017. After each request, [the Instituion] made excuses and delayed turning over partial student records. Again, [the Instituion's] actions caused [the Student] to be forced to make multiple demands, increasing the burden and hardship for the student. [The Institution] intentionally obstructed the release of student records to discourage and defer access to damaging evidence of [the Institution] malfeasance. [The Instution's] handling of the education records request is contrary to FERPA's intent of full release and disclosure upon a student request.

Student further alleges through Counsel that the Institution violated the Student's rights under FERPA when it did not provide her with complete access to her education records. Specifically, Counsel states:

> …[The Institution] failed to provide all of the [Student's] FERPA records in violation of 20 U.S.C. s. 1232 (g)(1)(A)(2011). [The Student] requested a list of records several times that fall within the definition of student records under FERPA. [The Institution] admits that they are no longer in possession of some of the records. In other cases, [the Institution] provided records that were incomplete. [The Institution] did not disclose computation of grades, records of bumping down of grades, and scantron answer (not test question) keys. We allege that [the Institution] is intentionally hiding these FERPA student records because those records would provide proof of tortious acts committed by several law professors. [The Student] disputes that all records were provided. The requested FERPA records are material and relevant to a FERPA hearing to provide proof of inaccurate and misleading grades on the transcript.

Section 99.10(a) and (b) of the FERPA regulations state:

> Except as limited under § 99.12, a parent or eligible student must be given the opportunity to inspect and review the student's education records.
>
> \*        \*        \*        \*        \*
>
> The educational agency or institution … shall comply with a request for access to records within a reasonable period of time, but not more than 45 days after it has received the request.

We note that while a school is required to provide an eligible student access to education records, it is not generally required by FERPA to provide *copies* of education records. However, if circumstances effectively prevent an eligible student from exercising his or her right to inspect and review education records, the school would be required to either provide the eligible student with a copy of the records requested or make other arrangements that would allow for the eligible student to inspect and view the requested records. For example, a school could be required to provide copies, or make other arrangements for inspection and review, if the student did not live within commuting distance of the school.

Page 4 – Mr. Mark Rosenburg

While a school would be required to conduct a reasonable search for education records, it is the responsibility of the student to clearly specify the records to which he or she is seeking access. If a student makes a "blanket" request for a large portion of his or her education records and the student believes that he or she was not provided certain records which were encompassed by that request, he or she should submit a follow-up request clarifying the additional records he or she believes exist.

Also, a school is not required by FERPA to provide anyone other than the eligible student access to, or copies of, the student's education records, even if the student has provided appropriate written consent for disclosure to that party.

<u>Allegation 3:</u>

Student through Counsel alleges that the Institution violated § Section 99.20 of the FERPA regulations when it denied the Student's request for a hearing to amend certain of the Student's education records and failed to comply with FERPA's amendment provisions for hearings. Specifically, Counsel states:

1. [The Institution] failed to comply with a request for a FERPA hearing in violation of 20 U.S.C. 1232(f) and 20 U.S.C. 1232(g). On August 17, 2017, [the Student] requested a FERPA hearing directly to FIU's President Rosenberg. [The Student] made this request because [the Student] alleges in good faith that [the Student's] student records are inaccurate and misleading. [The Student] had spent three months asking that [the Institution] review [the Student's] grades and scoring on assignments of [the Student's] 1L year. [The Student] felt that [the Student] has the right to a FERPA hearing because [the Student] continues to allege that [the Student's] grades are fraudulent and inaccurate. [The Institution] did not review all [of the Student's] grades for computational errors. [The Student] requested a FERPA hearing because the issue of student record accuracy was not settled. [The Student] did not provide or schedule a FERPA hearing.

2. [The Institution violated FERPA when it] responded to [the Student's] request for a FERPA hearing by referring her to a "grievance process." [The Institution's] Interim Associate Dean for Academic Affairs, Ms. Rosenthal emailed in response to the FERPA hearing request that the "grievance process" is an "informal resolution of student complaints." [The Institution] would only deal with a student complaint about misconduct of one professor. An informal grievance is not a FERPA hearing. A grievance process is in contraposition to the statutory vested right to a formal FERPA hearing. [The Institution] ignored all complaints about fraudulent grading and about several other professors. We allege that [the Institution] purposely avoided a FERPA hearing to cover-up [the Institution's] professor's tortious acts.

3. We continue to claim that [the Institution] has no stated FERPA process for its students. However, if [the Institution] is allowed to use FIU Undergraduate's FERPA policy, then we allege that FIU failed to follow that process. FIU

Page 5 – Mr. Mark Rosenburg

Undergraduate has a written process that states that If a "request for amendment to education records was not settled" then the request is forwarded to FIU's Vice-President for Academic Affairs. Upon receipt of the request, FIU shall "appoint a disinterested University official to serve as the hearing officer." FIU's FERPA policy also states that FIU shall "schedule a hearing within 25 days of the date of receipt of the request for hearing." FIU failed to follow its published process at every step. FIU did not refer the request for FERPA hearing to FIU's Vice-President for Academic Affairs. The Interim Associate Dean of [the Institution] is not the same person. FIU did not appoint a disinterested University official to serve as the hearing officer." Ms. Rosenthal is not a "disinterested" University official. She is part of the same faculty that we allege committed the discrimination and retaliation against [the Institution]. Ms. Rosenthal did not represent herself as a "hearing officer" and she did not appoint a "hearing officer." FIU failed to "schedule a hearing within 25 days of the date of receipt of the request for hearing." Ms. Rosenthal refused to meet with [the Student] because [the Student] was represented by an attorney. Ms. Rosenthal terminated the grievance process and never followed through with any investigation or setting of a hearing date. FIU and/or Ms. Rosenthal never contacted [the Student] again. FIU is in strict violation of FERPA because it failed to follow its stated process that would have allowed [the Student] to amend inaccurate information of her education records.

4. Furthermore, FIU committed the most egregious unethical conduct: FIU denied [the Student] the assistance of counsel. On June 26, 2019, FIU was placed on formal notice of pending litigation. Ms. Rosenthal denied [the Student] the assistance of counsel during discussions about the grievance process. Ms. Rosenthal is a law professor and a member of The Florida Bar, and knows that any conversation with an adversarial party in the pre-suit period is highly prejudicial to my client. FIU has claimed that Ms. Rosenthal is serving in her capacity as an administrator. That claim is completely disingenuous. Ms. Rosenthal is acting as FIU's agent on FIU President's and General Counsel's orders. All conversations with Ms. Rosenthal would be admissible and likely to be used by FIU, the opposing party, as adversarial evidence. FERPA rules permit the use of an attorney for FERPA hearings. It is FIU's statutory duty to comply with FERPA's intent to permit the assistance of counsel in educational records disputes. The fact that Ms. Rosenthal was requesting an informal meeting (rather than a FERPA hearing) with [the Student] and prohibited … [Counsel] from attending is a difference without meaning. [The Institution], an institution charged with training future attorney's, abridged [the Student's] rights to an attorney.

Under FERPA, a school is required to consider a student's request for amendment of an education record, to inform the student of its decision, and if the request is denied, to advise the student of the right to a hearing on the matter. 34 CFR § 99.20. If, as a result of a hearing, a school decides not to amend the record, then the student has the right to insert a statement in the

Page 6 – Mr. Mark Rosenburg

record setting forth his or her views. 34 CFR § 99.21. That statement must remain with the record for as long as the record is maintained. 34 CFR § 99.21(c).

However, a school is not required by FERPA to afford a student the right to seek to change substantive decisions made by school officials, such as grades or evaluations. This fact is indicated in the legislative history of FERPA. The primary source of legislative history regarding FERPA is contained in the "Joint Statement in Explanation of Buckley/Pell Amendment," Volume 120 of the Congressional Record, pages 39862-39866. The Joint Statement states that FERPA was "not intended to overturn established standards and procedures for the challenge of substantive decisions made by an educational institution." (Emphasis added.) FERPA was intended to require only that educational agencies and institutions conform to fair recordkeeping practices and not to override the accepted standards and procedures for making academic assessments. For example, evaluations and other records related to a student's performance, upon which a grade may be based, would only be subject to the FERPA amendment procedure if they contain inaccurately recorded information, such as a wrong date or misspelled name.

Section 99.22 of the FERPA regulations sets forth the minimum requirements for conducting a hearing under the FERPA amendment provisions. In particular, the regulations provide:

> The educational agency or institution shall make its decision in writing within a reasonable period of time after the hearing.

> and

> The decision must be based solely on the evidence presented at the hearing, and must include a summary of the evidence and the reasons for the decision.

34 CFR § 99.22(e) and (f).

Implicit in these provisions is the understanding that students who seek amendment of their education records under the FERPA amendment procedure will be provided a copy of the decision made subsequent to a hearing, including the summary of the evidence and the reasons for the decision.

To complete the procedure outlined in § 99.65(a)(2) of the FERPA regulations, please investigate the Student's allegation and provide this Office a written response within four weeks after you receive this letter. Please refer to complaint number 2067 in the Institution's written response and mail the response to:

> Family Policy Compliance Office
> U.S. Department of Education
> 400 Maryland Avenue, SW
> Washington, D.C. 20202 – 8520

Page 7 – Mr. Mark Rosenburg

If you have any questions specific to this complaint, please contact this Office, referencing your complaint number, via email at FERPA.Complaints@ed.gov, or phone at 202-260-3887 and select Option #3.  For general information concerning FERPA and the Office's complaint procedures, please visit our website at https://studentprivacy.ed.gov/.

Sincerely,

Dale King
Director
Family Policy Compliance Office

cc: Counsel
    Student

**U.S. DEPARTMENT OF EDUCATION**
WASHINGTON, DC 20202

**OFFICIAL BUSINESS**
PENALTY FOR PRIVATE USE $300

Mail Stop 6620

CAP DISTRICT
MD 207
05 JUN '18
PM 2 L

$ 00.68⁰
PITNEY BOWES

02 1R
0002006818    JUN 05 2018
MAILED FROM ZIP CODE 20001

UNITED STATES POSTAGE

Ms. Diana McLaughlin
2336 Immokalee Road
Naples, FL 34110

34110-141436

# EXHIBIT 46

2336 Immokalee Road
Naples, FL 34110
Phone:  239.229.8481
Email: drdiana@dianamclaughlin.com



December 7, 2018

Elizabeth D. Devos,
U.S. Secretary of Education
Department of Education Bldg.
400 Maryland Ave., SW
Washington, D.C.  20202-1100

**Sent Via United States Certified Mail and Email to Michael.Hawes@ed.gov and FERPA.Complaints@ed.gov**

> Re:  FPCO Complaint 18-0184
>        FPCO Complaint 2067

Dear Madam Secretary,

This correspondence serves as the fourth formal complaint regarding the Family Policy Compliance Office.  The FPCO is the perpetrator of a grotesque abuse of authority by a federal government agency.  We are prepared to argue that the FPCO's actions are an unconstitutional violation of the separation of powers.  December 4, 2018, marks the one year anniversary since FPCO has failed to make a determination on Ms. Christina McLaughlin's FERPA complaint.  We allege, in good faith, that the FPCO has intentionally stonewalled this complaint for one year based on Ms. McLaughlin's political affiliations.  Specifically, we assert that the deep state, anti-Trump bureaucracy at the Department of Education is obstructing the completion of this FERPA complaint. In spite of rights statutorily vested with the student/complainant, the FPCO has purposefully stalled the investigation while protecting the rights of a large state university.  This complaint stems from Florida International University's governing university system and Florida International University College of Law's discrimination and retaliation against Ms. McLaughlin (a law student) because she is a Conservative Trump supporter.  We assert that the FPCO has handled Ms. McLaughlin's complaint unlawfully, unethically, and unconstitutionally.  At this point, we assert that any findings or determination made by the FPCO are the fruit of the poisonous tree and therefore, unlikely to fully protect Ms. McLaughlin's vested statutory rights under FERPA.

As of October 5, 2018, the FPCO was in receipt of Ms. McLaughlin's rebuttal to FIU's answer to the DOE notice of investigation.  On November 1, 2018, Mr. Michael Hawes, acting FPCO Director, called me of his own volition.  He made verbal assurances that the FPCO would complete reviewing the complaint, FIU's answer to the notice of investigation and Ms. McLaughlin's rebuttal to that answer "within the next couple of weeks."  Additionally, Mr. Hawes effectively admitted that the Department of Education has lost or destroyed Ms. McLaughlin's original complaint with the supporting documentation.[1]  Mr. Hawes also confirmed that the FPCO, through its former director, Mr. Dale King, intentionally provided FIU with all the arguments and defenses against Ms.

---

[1] Mr. Hawes response to the direct, simple question:  "Does the FPCO have Ms. McLaughlin's original complaints and exhibits?  Mr. Hawes Answer:  "I can neither confirm nor deny that."

McLaughlin's complaint because the FPCO has a policy of working cooperatively with universities to get their voluntary compliance with FERPA in violation of explicit language of rule 34 CFR 99.65. Mr. Hawes admitted that the FPCO, in practice, is a regulatory statute whose main purpose is to achieve educational institutions voluntary compliance and not to protect individual student/complainant's vested rights.  Mr. Hawes also refused to disclose the precise nature of communications with FIU violating the FPCO's duty of transparency and disclosure to the student complainant.  After another three weeks delay, on November 21, 2018, Mr. Hawes answered our status inquiry email by writing that the FPCO would be completed "shortly."  After another week delay, on November 27, 2018, we emailed Mr. Hawes a status update, but he did not respond but did sign a "read receipt."  After another week delay, on December 7, 2018, we again emailed Mr. Hawes a status inquiry.  Again, he did not respond but signed a "read receipt."  We have yet to receive a determination for more than **369 days since the initial complaint was filed**.

In sum, the timeline of this FERPA complaint is as follows:

8/2016        FIU College of Law failed to provide proper FERPA notice.

10/2016 to 5/2017      FIU College of Law and its professors began a systematic and purposeful discrimination and retaliation of Ms. McLaughlin for her active support of Republican candidates and Donald Trump's presidency.

5/2017        FIU law professors fraudulently tampered with Ms. McLaughlin transcript to create a fraudulent academic dismissal.

5/2017 to 8/2017      FIU failed to allow Ms. McLaughlin to review all her inaccurate and misleading educational records within forty-five days of the student's request.  FIU intentionally withheld many educational records that would disclose professors' fraudulent tampering with grades and the use of non-academic reasons for grades.  FIU refused to provide a FERPA hearing upon the disputed student's request.  FIU failed to permit Ms. McLaughlin to place a statement on her disputed student records likely for the purpose of making the transferring to another law school difficult or impossible.  FIU denied Ms. McLaughlin the assistance of counsel of her choice during this FERPA dispute to disadvantage her when all her communications were with FIU attorneys.

12/04/2017    Department of Education receives Ms. McLaughlin's timely FERPA complaint.

03/15/2018    Ms. McLaughlin's attorney sends correspondence requesting status of complaint after a 3 month delay with no response.

03/20/2018    Mr. Miller, FPCO assistant director, responds with an antagonistic email that (1) blamed Ms. McLaughlin for the Department of Education mishandling; (2) placed new obstacles on proceeding with a review; (3) falsely dated the complaint receipt date as of March 2018 resulting in Ms. McLaughlin in potential violation of 20 USC 1232(g)(b)(4)(B),(f),(g).

04/15/2018    Attorney McLaughlin response to Mr. Miller's email.

04/17/2018    First letter of complaint to Secretary Devos of Department of Education mishandling.

04/21/2018    Ms. McLaughlin restated and summarized the substance of her FERPA complaint as per Mr. Miller's request.  This request was burdensome and redundant and likely provoked by the FPCO destruction of the original complaint and accompanying documents and evidence.

05/03/2018    Mr. Dale King, FPCO Director, responds on Secretary Devos behalf and apologizes for the Dept. of Education's mishandling and resets the date of receipt as of December 4, 2017.

05/08/2018    Ms. McLaughlin's email response requesting that the FPCO expedite Ms. McLaughlin's complaint.

05/29/2018    FPCO finally sends a Notice of Investigation to FIU.  However, the notice of investigation was a pre-digested answer that provided full arguments and defenses to Ms. McLaughlin's complaints in violation of FERPA's legislative intent.  The FPCO's notice of investigation also mischaracterized and omitted the Joint Statement.

07/11/2018    FIU returned an answer to the Notice of Investigation using large block quotes and all of the defenses provided by the FPCO.  The FPCO failed to notify us of this receipt for the next 8 weeks obstructing the student complainant from returning a prompt rebuttal and further stalling Ms. McLaughlin's right to filing a lawsuit.

08/28/2018    Email to Mr. King requesting a status update of FIU response to the notice of investigation.  No response from Mr. King.

08/30/2018    Second letter of complaint to Secretary Devos because Ms. McLaughlin had not received any communications from the FPCO since the Notice of Investigation was sent to FIU.

09/07/2018    Mr. King's response on Secretary Devos' behalf providing FIU's answer to Ms. McLaughlin's complaint.

10/05/2018    Ms. McLaughlin provides a timely, detailed rebuttal with supporting documentation to FIU's answer.  No response received from FPCO of receipt and status of complaint.

10/18/2018    Third letter of complaint to Secretary Devos for the mishandling and stonewalling of Ms. McLaughlin's complaint.

11/01/2018    Received a phone call from Mr. Hawes, the new Acting Director of the FPCO; stating that the FPCO's determination would be forthcoming within two weeks.

11/21/2018    Emailed Mr. Hawes for status update.  Mr. Hawes responded that the FPCO determination would be forthcoming "shortly."  See attached email response.

11/27/2018    Emailed Mr. Hawes for a status update.  Mr. Hawes returned a "read receipt" but he did not respond.  See attached read receipt.

12/7/2018    Emailed Mr. Hawes for a status update.  Again, Mr. Hawes returned a "read receipt" but he did not respond.  See attached read receipt.


On April 17, 2018, we formally complained of the undisputed fact that the Department of Education mishandled Ms. McLaughlin's original complaint causing more than a three month delay

without any action.  On August 30, 2018, we wrote you again to complain that the FPCO had intentionally delayed informing us of any response from FIU that would allow Ms. McLaughlin the opportunity for a prompt rebuttal.  We also complained that the FPCO provided aid and support to the education institution to the detriment of the student complainant exceeding FERPA's explicit rules and legislative intent.  On October 18, 2018, we wrote you again formally complaining that the sum total of FPCO's actions constitutes a partnership with FIU to obstruct and deprive the enforcement of Ms. McLaughlin's individual vested rights pursuant to FERPA.  This is the fourth formal complaint against the FPCO's harmful actions against Ms. McLaughlin.

The FPCO, through its acting Director Mr. Hawes, has violated Ms. McLaughlin's constitutional rights and vested FERPA rights.  Mr. Hawes' interpretation of FERPA's statutory mandate is a subversion of FERPA's legislative intent.  We understand that FERPA explicitly deprives a student complainant of a private cause of action for harm done by an educational institution's FERPA violations.  However, Florida explicitly gives students a private cause of action in equity pursuant to FERPA's total incorporation into Florida law.  Florida law also confers a property interest in a college education.  The FPCO's stonewalling and lack of assistance to the student has abridged her Florida statutory right because a lawsuit would toll any investigation by the FPCO.  The FPCO is aware of the above facts and continues to cause irreparable harm to Ms. McLaughlin.

Mr. Hawes also implied, in his conversation, that the FPCO has no discretion to provide any remedy that would restore Ms. McLaughlin's vested FERPA rights.  Mr. Hawes also stated that the FPCO mostly functions to provide education and support to educational institutions.  Mr. Hawes implied that the FPCO does not have any mandate to restore a student's FERPA rights after the harm to the student has occurred.  He stated that the FPCO's regulatory mandate is enforced going forward and therefore has never amounted to the removal of any federal funds.  FERPA vests rights in the student/complainant, not in the university.  Ms. McLaughlin is prepared to argue that the FPCO's interpretation and implementation of FERPA is unlawful because of an unconstitutional violation of separation of powers.

The FPCO's actions are unconstitutional for the following reasons:

1. FERPA's plain and unambiguous language does not explicitly preclude the FPCO from mandating an educational institution to restore Ms. McLaughlin's right to inspect her educational records and if there remains a dispute about inaccurate and misleading records afford Ms. McLaughlin the opportunity for a FERPA hearing and place a statement on her educational record.  The FPCO's interpretation, that past FERPA harms committed by universities against students is not correctable and non-remediable, is unconstitutional subversion of legislative intent.
2. The FPCO's foreclosing of a student/complainants right to correct an educational institution's FERPA violations retroactively is not at all supported by any explicit statement in FERPA rules, Joint Statement, or Department of Education policy statements.  Ms. McLaughlin alleges that she is the victim of FIU's violation of FERPA and has suffered actual harm.  FERPA's denial of a student/complainant's private cause of action places a greater burden on the FPCO to protect and restore a student's FERPA rights.  The FPCO's implementation of FERPA which only works cooperatively with educational institutions and adversarial with the student/complainant is unconstitutional on its face.
3. FERPA is silent on the remedy available against an educational institution's intentional malfeasance and bad faith.  We allege that FIU's FERPA violations were malicious and

with forethought for the purpose of depriving law students of their FERPA rights (and substantive and procedural due process rights). FIU's malfeasance is further illustrated by their repeated falsehoods and omissions in their answer to the FPCO's notice of investigation. The FPCO's interpretation that the Department of Education has no executive branch discretion to afford greater scrutiny and oversight over educational institution's intentional bad acts is not supported by any explicit language or authority. Ms. McLaughlin is prepared to argue that intentional malicious FERPA violations heightens the FPCO's statutory mandate to enforce an individual student's rights because FERPA has denied a student's right to judicial review.

We allege that secondary educational institution lobbying blocs have exerted excessive influence on the FPCO over the past thirty-five years. We allege that the FPCO works in partnership with universities instead of protecting student's rights with scrutiny and oversight. In this case, the facts will likely support that the FPCO has stonewalled, and mishandled Ms. McLaughlin's complaint for the past year. The FPCO's actions have excessively burdened Ms. McLaughlin and caused irreparable harm. We also allege that the FPCO's mishandling of this complaint constitutes new rule-making without undergoing proper rule-making procedure. In this case, we allege that the FPCO has had willful blindness and may even be colluding with FIU to permit the weaponization of FERPA for the purpose of depriving student complainants of their vested rights and conceal FIU's tortious acts.

We respectfully request that the Department of Education commence a formal investigation as to the handling of Ms. McLaughlin's FERPA complaint. Please, let us know whether or not the Department of Education intends to properly enforce federal law. We reserve all rights under federal law to enforce Ms. McLaughlin's rights as a student complainant.

Sincerely,

DIANA MCLAUGHLIN, M.D., M.B.A., Esq.
Florida Bar Number: 84479
2336 Immokalee Road
Naples, FL 34110
Phone: (239) 229-8481
Email: drdiana@dianamclaughlin.com


Cc:    Office of the General Counsel, U.S. Department of Education
       The President of the United States of America. The White House
       Mr. Michael Hawes, Acting Director of the Family Privacy Compliance Office
       The Honorable Lamar Alexander, U.S. Senate, Committee on Health, Education and Pensions
       The Honorable Virginia Fox, U.S. House of Representative, Committee on Education and Workforce

# EXHIBIT 47

**2336 Immokalee Road**
**Naples, FL 34110**
**Phone:  239.229.8481**
**Email: drdiana@dianamclaughlin.com**



Diana
McLaughlin | M.D.
M.B.A.
Esq.

*Medicine • Business • Law*

April 22, 2019

Elizabeth D. Devos,
U.S. Secretary of Education
Department of Education Bldg.
400 Maryland Ave., SW
Washington, D.C.  20202-1100

**Sent Via Federal Express Tracking Number 775024729850**

Re:  FPCO Complaint 18-0184
FPCO Complaint 2067

Dear Secretary Devos,

"Disgraceful" is the only word that describes the handling of Ms. Christina McLaughlin's FERPA complaint.  Seventeen months without a determination.  Ten months have passed since the FPCO issued a Notice of Investigation to Florida International University (FIU) without a determination.  This is the 20th communication concerning this complaint without a determination.   The Department of Education has admitted mishandling the complaint from the outset.  Any further excuses cannot be reasonable and likely subject to discovery.  The Department's continual mishandling can only be intentionally malicious.

Ms. McLaughlin is a fervent conservative, Trump supporter since 2016.  She has had her right to freedom of political expression and vested rights under FERPA violated by FIU and then by the State of Florida Board of Governors.  And now the Family Privacy Compliance Office (FPCO) is purposely delaying a final letter of determination to protect FIU and to infringe her fundamental constitutional and statutory rights because she is a conservative student.  How does the Department pretend to enforce Executive Order No. 13864 when the Department itself is the offender of abrogating a conservative student's right to freedom of expression?  The Department of Education FPCO is the executive branch's marquee for the deep state, liberal, anti-conservative, Anti-Trump bureaucracy.

Michael Hawes, Director of Student Privacy Policy, is the Department's "confidence man."  He has stated that he completed the final draft of the determination 4 months ago in January 2019.  He has repeatedly promised that the determination would be forthcoming "shortly" and then repeatedly stalled again and again.  Mr. Hawes stated that Ms. McLaughlin's complaint was one of 5 top priority complaints because of the Department's admitted mishandling.  But, he has stalled for another 4 months since finishing the determination likely because the FPCO is hoping to create a statute of limitation defense for FIU and the State of Florida and to damage the student.

We are tired of Mr. Hawes continually toying with Ms. McLaughlin.  We are frustrated with the Department's nullification of its statutory duty.  The Department must issue a determination and make it available to us by Email no later than Tuesday, 5 p.m. May 10, 2019. After May 10, 2019, the Department's actions will no longer be "disgraceful" and will become "unlawful."  The U. S. Department of Education is on formal notice that Ms. McLaughlin will file suit against the Department and seek all remedies allowed by law.

Thank you for your attention.

Sincerely,

DIANA MCLAUGHLIN, M.D., M.B.A., Esq.
Florida Bar Number:  84479
2336 Immokalee Road
Naples, FL  34110
Phone: (239) 229-8481
Email: drdiana@dianamclaughlin.com

Cc:      President Donald J. Trump

# EXHIBIT 48

1974, the educational community has pointed to certain ambiguities that have been contained in the language and provisions—that because there was none of the normal legislative history, it means that HEW does not have an adequate record on the basis of which to develop the necessary regulations.

After consultation with the Senator from Rhode Island, we concluded that the most appropriate way to handle the situation would be to offer at this time the amendment I have just submitted to the desk on our joint behalf, which incorporates the necessary clarifications.

I also send to the desk at this time a statement that Senator PELL and I have agreed to, which provides a narrative and explanation of the meaning and intent of the various provisions of the amendment. I ask unanimous consent that the statement be printed in the RECORD.

There being no objection, the statement was ordered to be printed in the RECORD, as follows:

JOINT STATEMENT IN EXPLANATION OF
BUCKLEY/PELL AMENDMENT

The Family Educational Rights and Privacy Act of 1974, section 513 of the Education Amendments of 1974, was signed into law by President Ford on August 21, 1974. Its provisions became effective ninety days after enactment, on November 19.

The purpose of the Act is two-fold—to assure parents of students, and students themselves if they are over the age of 18 or attending an institution or postsecondary education, access to their education records and to protect such individuals' rights to privacy by limiting the transferability of their records without their consent. The Secretary of Health, Education, and Welfare is charged with enforcement of the provisions of the Act, and failure to comply with its provisions can lead to withdrawal of Office of Education assistance to the educational agency or institution.

Since the passage of the Act, commonly referred to as the Buckley Amendment, after its principal sponsor, a number of ambiguities in its provisions have come to light. Since the language was offered as an amendment on the Senate floor, rather than having been the subject of Committee consideration, traditional legislative history materials such as hearings and Committee reports have not been available to serve as a guide to educational institutions, to students, and to the Department of Health, Education, and Welfare in carrying out their various responsibilities under the Act. The amendments being proposed are designed to remedy certain omissions in the provisions of existing law and to clarify other portions of the Act which have been the subject of extensive questioning and concern. It is the hope of the sponsors of these amendments that they provide a suitable response to the issues surrounding existing law which have been raised by parents, students, and institutions.

Existing law lists specifically, at several points in the Act, the institutions and agencies to which the provisions apply. However, these lists are not always identical, creating questions of the applicability of the Act to certain institutions under certain circumstances. The amendment, to standardize the Act's applicability, defines the term "educational agency or institution" as any public or private agency or institution which is the recipient of funds under any applicable program. This definition serves to clarify a number of issues. First, it makes uniform the Act's applicability under all its subsections, so that no question remains of a school's inclusion under one part of the Buckley Amendment but not under another. Second,

by defining the term generically rather than specifically, the amendment eliminates the possibility that any agency or institution not meeting the specific definition might fall outside the Act's coverage. Finally, by explicitly limiting the definition to those institutions participating in applicable programs, the amendment makes it clear that the Family Educational Rights and Privacy Act applies only to Office of Education programs and those programs delegated to the Commissioner of Education for administration. The entire Buckley Amendment is an amendment to Part C of the General Education Provisions Act, which by its own terms applies only to the Office of Education. However, there has been some question as to whether the Amendment's provisions should be applied to other HEW education-related programs such as Headstart or the educational research programs of the National Institute of Education. As rewritten, the limited nature of the Act's coverage should be clear.

Under the Family Educational Rights and Privacy Act, a parent is given the right to challenge the contents of his child's records to insure that they are not inaccurate, misleading, or otherwise in violation of the student's privacy or other rights. This provision, section 438(a)(2) of the General Education Provisions Act, has raised a number of questions which these amendments seek to answer—1) who has the right to challenge, 2) what records are covered, and 3) what sort of proceeding should be undertaken.

First, these amendments clarify that the parent need not have a child still in attendance at the educational agency or institution at the time a hearing is sought in order to have the right to seek a hearing on the accuracy or appropriateness of material in his child's file. The Buckley Amendment does give parents the right to challenge the contents of records once their children have left the school possessing the records in order to assure that records still maintained by the school which could subsequently become available to parties outside the school do not contain inaccurate or inappropriate material.

In addition, the material subject to challenge is defined generically as "education records," eliminating the long list of illustrative examples contained in existing law. "Education records" are described as those records, files, documents, and other materials directly related to a student which are maintained by a school or by one of its agents. This definition is a key element in the amendment. An individual should be able to know, review, and challenge all information—with certain limited exceptions—that an institution keeps on him, particularly when the institution may make important decisions affecting his future, or may transmit such personal information to parties outside the institution. This is especially true when the individual is a minor. Parents need access to such information in order to protect the interest of their child.

The amendment makes certain reasonable exceptions to the access by parents and students to school records. The private notes and other materials, such as a teacher's daily record book, created by individual school personnel (such as teachers, deans, doctors, etc.) as memory aids would not be available to parents or students, provided they are not revealed to another person, other than in the case of a substitute who performs another's duties for a temporary period.

The law enforcement records of a law enforcement unit associated with a school would be excluded if its personnel are not allowed access to a student's education records, and if its records on a student are used solely for law enforcement purposes and are only available to other law enforcement officials of the same jurisdiction.

The employment records of a person not

attending a given school would not be available to him, even though he has been a student at another school, if they are used for other than employment purposes.

College students would not be able directly to inspect medical psychiatric, or similar records which are used solely in connection with treatment purposes and only available to recognized professionals or para-professionals in connection with such treatment. Such students would, however, be able to have a doctor or other professional of their choice inspect their records.

The amendment also notes that the law does not alter the confidentiality of communications otherwise protected by law.

The law is not specific concerning the format, procedure, or mechanism for the conduct of such a hearing at the local level. It is the intent of the sponsors of these amendments that again a rule of reason would be followed by those participants involved. Since the hearing is to be conducted at the local level, a detailed specification of procedures cannot be drawn that could possibly apply to each of the thousands of school districts and colleges across the nation. Each has a slightly different organizational structure and pattern of procedure. Obviously, the hearing mechanism must be adapted in each instance to conform to these individual differences. In some cases, a school district might wish to offer the parent a hearing at the district level; in other instances, disputes about the content of records might be better handled at the local school level. It is not the intent of the Amendment to burden schools with onerous hearing procedures.

The amendment is intended to require educational agencies and institutions to conform to fair information record-keeping practices. It is not intended to overturn established standards and procedures for the challenge of substantive decisions made by the institution. It is intended, however, to open the bases on which decisions are made to more scrutiny by the students, or their parents about whom decisions are being made, and to give them the opportunity to challenge and to correct—or at least enter an explanatory statement—inaccurate, misleading, or inappropriate information about them which may be in their files and which may contribute, or have contributed to an important decision made about them by the institution.

The law intends that parents have a full and fair opportunity to present evidence to show that their children's records contain inaccurate, misleading or otherwise inappropriate information. The hearing should be held and the institution's decision rendered within a reasonable period after the parent's request. There has been much concern that the right to a hearing will permit a parent or student to contest the grade given the student's performance in a course. That is not intended. It is intended only that there be procedures to challenge the accuracy of institutional records which record the grade which was actually given. Thus, the parents or student could seek to correct an improperly recorded grade, but could not through the hearing required pursuant to this law contest whether the teacher should have assigned a higher grade because the parents or student believe that the student was entitled to the higher grade.

On the other hand, if a child has been labeled mentally or otherwise retarded and put aside in a special class or school, parents would be able to review the materials in the record which led to this institutional decision, and perhaps seek professional assistance, to see whether these materials contain inaccurate information or erroneous evaluations about their child.

In general, it is intended that the parent would be shown the actual documents contained in the child's education records. However, under certain circumstances this might not be possible—where, for instance,

*December 13, 1974*     **CONGRESSIONAL RECORD — SENATE**     39863

it is impossible to separate information about one student from that about others. If a student's name is one in a long list of names, it would violate the others' right to privacy to have the entire list shown to that student's parents. In such a situation, the responsibility of the educational agency or institution is to make the information concerning the student known to the parent, without actually having to show him the document.

Existing law prohibits the furnishing of personally identifiable information contained in school records to other than a specific list of persons, primarily other school officials, without the written consent of the student's parents or that of the student when he becomes 18 or enters postsecondary education. A literal interpretation of this language has led school attorneys around the country to advise their clients no longer routinely to print football players' weights in athletic programs and to seek written consent of the cast of the school play that their names may be printed in the program. This narrow reading of the law is not what its author intended to achieve, and he so stated during the floor debate in May on the amendment.

Therefore, these amendments specifically provide that a school may safely provide what is termed "directory information"—such personal facts as name, address, and telephone number—to third parties without fear of having its Federal funds withdrawn. The institution providing such directory information would be required to give public notice of the information it planned to make available to the general public, and to allow parents time to notify the institution that any or all of that information should not be released. This would allow parents with unlisted telephone numbers, for example, to have the right to keep such numbers unlisted.

On the other hand, clarification of the definition of "directory information" can be significant in allowing the functioning of other programs. For example, under the Guaranteed Student Loan Program a student is allowed a nine-month grace period after his last date of attendance before he is required to begin repayment of his obligation. If a school cannot routinely inform the lender of the student's last date of attendance, the lender has no basis for calculating when he may begin to collect the loan. These amendments would avoid this problem by making such information available on a routine basis, without a requirement that the student give his consent.

Much concern has been expressed by institutions of higher education concerning the potential impact of the Buckley Amendment on a number of traditional institutional practices. For instance, letters of recommendation for admission are usually solicited under a promise that such letters will not be available to the student, to his parents, or to third parties not associated with the purpose of the recommendation. What is their status if they become part of a student's permanent official file? Also, in conjunction with an application for student financial aid, a parent may have to file a financial statement. Should a student be given the right to see such a statement? If a student has acquired rights under the Amendment, can an institution require or suggest that he waive those rights and preserve the confidentiality of its files? These amendments seek to answer these and other questions.

A number of exceptions to the blanket right to see and challenge education records are made for students attending institutions of postsecondary education. They shall not have the right, under the provisions of the Amendment, to see financial records of their parents. They shall not have the right to see confidential letters and statements of recommendation placed in education records

prior to January 1, 1975, provided that they are not used for purposes other than those for which they were intended. And students may waive their rights of access to confidential recommendations in three areas—admissions, job placement, and receipt of awards. To protect students from wholesale abuse of such continued possibility of confidentiality, the amendments require that a student be notified of the names of all persons making confidential recommendations, if he does agree to waive his right of access. This notification would include not only those individuals suggested by the student as possible references, but also any others solicited by the institution or volunteering their comment.

With regard to letters of recommendation for a student in an institution of postsecondary education, two further clarifications are included. The use of confidential recommendations is limited solely to the purpose for which they were specifically intended. Such recommendations should not become a part of the student's on-going file and serve as a basis for continued official decision-making for purposes other than for which such letters were originally submitted. Second, the "student" to whom the right of access belongs is defined as any person concerning whom the educational agency maintains education records or personal information, but does not include anyone who has not been in attendance at such agency or institution. This means that the rejected applicant for admission is not given the right under the Buckley Amendment to see and challenge his letters of recommendation, nor does the amendment give him the right to challenge the institution's decision not to admit him. Such a right accrues only to the individual who actually attends the institution. For the purpose of this definition, a student who is only auditing a course, but on whom the institution maintains a personal file, would be included in the Amendment's coverage.

Section 438(b)(1) of existing law restricts transfer, without the consent of parents or students, of personally identifiable information concerning a student to other educational agencies or institutions, other school officials, auditors from the General Accounting Office and the Department of Health, Education, and Welfare, and in connection with the application for or receipt of student financial aid under certain specified conditions. It has become apparent in the last several months that these restrictions are too narrow and, if strictly applied, would seriously interfere in the operation of educational institutions. Therefore, after consultation with numerous educational representatives as well as students, the authors of these amendments have included a series of other potential recipients of student information, without the necessity of securing individual parents' consent.

First, these amendments permit the transmittal of personal information to State and local officials or authorities as required by State statute. It was not intended, in establishing a minimum Federal standard for record confidentiality and access, to preempt the States' authority in the field. Therefore, if a State law requires an educational official to transmit a specific piece of information about a student to State or local officials, or liberalizes a student's access to his own education records even farther than the Family Educational Rights and Privacy Act, such as in Maine, Idaho, and New Mexico, where the law permits students of any age to see their records, State law may be followed without securing a parent's specific consent. Of course, the provisions of the amendment do not affect whatever rights a student or his parents might have in civil proceedings, as in the case where confidentially-received material causes the student or his parents actionable damage.

Organizations such as the Educational Testing Service, the Law School Admissions Council, the College Entrance Examination Board, and the American Medical College Application Service, and others, develop and validate a number of tests which are used by institutions of higher education to predict the potential success of applicants for admission. These and other similar groups need student data in order to perform their function. The amendments would authorize release of such data to these organizations without individual parents' or students' consent, so long as the data are not personally identifiable to the individuals and organizations receiving such data.

Similarly, accrediting agencies form the basis for institutional eligibility to participate in a wide range of Federal assistance programs. In order to assess the quality of an institution's program and the strength of the institution itself, the agency must have access to certain confidential student data. The amendments would authorize such access to enable the accreditor to carry out its functions.

One concern that has been expressed about the working of existing law pertains to the transfer of all parental rights to information to the student about the latter's attaining the age of 18 or enrolling in postsecondary education. Colleges have been reluctant to send bills or grades of their students to the students' parents, for fear of violating the students' rights. The amendments proposed would make it clear that the parent of a dependent student, as defined for income tax purposes, would have a right to information about his child without the institution's having to seek the students' consent.

Finally, under certain emergency situations it may become necessary for an educational agency or institution to release personal information to protect the health or safety of the student or other students. In the case of the outbreak of an epidemic, it is unrealistic to expect an educational official to seek consent from every parent before a health warning can be issued. On the other hand, a blanket exception for "health or safety" could lead to unnecessary dissemination of personal information. Therefore, in order to assure that there are adequate safeguards on this exception, the amendments provided that the Secretary shall promulgate regulations to implement this subsection. It is expected that he will strictly limit the applicability of this exception.

Because of the concern that regionalizing the enforcement of the law may lead to multiple interpretations of it, and possibly work a hardship on parents, students, and institutions, the amendment authorizes that only activities involving the conduct of hearings by the Secretary's review board may be carried out in the regional offices of HEW.

The remainder of the amendment is purely technical in nature, correcting erroneous cross-references found in existing law which were created as a result of changes made in the bill on the floor of the Senate and in conference. The provisions of the amendment are retroactive to November 19, 1974, the date on which the Family Educational Rights and Privacy Act became effective.

With guidelines not yet published, the provisions of the Act, and its ramifications, have been the subject of much uncertainty, causing perplexity among school officials and frustrations among parents and students. It is the hope of the sponsors of this amendment that it will do much to clear up many of the unanswered questions, so that the substance of the provisions may be carried out in schools and colleges across the country as soon as possible, and so that parents and students may properly begin to exercise their rights under the law, and the protection of their privacy may be assured.

Mr. MONDALE. Mr. President, I am somewhat concerned as are Senator WILLIAMS and Senator JAVITS about the provision of this amendment that would permit students to waive their rights to confidentiality of or access to their records. Under the provisions of this amendment would a postsecondary institution be permitted to require, as a condition of application, acceptance, or any other service normally provided to students at the institution, that a student sign such a waiver?

Mr. PELL. There is nothing in the proposed language which would permit an institution to require such a waiver as a precondition of application, or any other service normally provided to students at the institution.

Mr. MONDALE. Would there be any conditions under which an institution could compel any of its students to sign such a waiver?

Mr. PELL. Under the proposed language an institution would be permitted to request such a waiver of applicants or students but would not be permitted to require that the student waive his rights to either the confidentiality of his records, or his access to those records as a precondition to enrollment or matriculation or any other service normally provided to students at the institution under any circumstances.

Mr. MONDALE. Could a postsecondary institution request a student, at time of application for admission, or any time thereafter, to sign a general waiver which would effectively waive the student's rights to examine any recommendations at any time in the future? For example, under the proposed language, confidential statements or recommendations are split into three classes: Recommendations for applications of admission, for employment, and for honors or awards. Would, then, a postsecondary institution have to request the waiver for each of those classes of recommendations at the appropriate time?

Mr. PELL. A postsecondary institution could not request a general waiver which would apply for all time, but would have to ask for a waiver at the appropriate time for each class of confidential statement or recommendation.

Mr. BUCKLEY. Mr. President, in the course of the past weeks, the Senator from Rhode Island and his staff and my staff and I have been in frequent contact about the questions and problems which have arisen regarding the act. We have discussed the problems with representatives of the various educational groups and institutions, student groups, and public interest organizations. We have received a great deal of valuable information and suggestions, and I believe we have succeeded, after many hours of working together, to incorporate them all in language that I believe will meet every legitimate question that has been raised about the proposed legislation.

At this time, I should like to take occasion to express my deep personal appreciation of the tremendous spirit of cooperation and understanding that has been extended to me by the distinguished chairman of the subcommittee and to express my appreciation for his enormous sense of fairness.

Mr. PELL. Mr. President, I thank the Senator from New York.

I fully support and am, indeed, the cosponsor of the series of amendments offered by Senator BUCKLEY to the Family Educational Rights and Privacy Act. The Senator has introduced into the RECORD an agreed upon explanation of the amendments we have prepared which will serve as legislative history in interpreting the language of the amendments. I will, at a suitable point in the RECORD ask unanimous consent for the printing of a document which in a report on legislation would be termed a cordon print. It will show the changes in the existing law; what has been deleted and where the new language fits and how it will be read after adoption of these amendments.

I wish to thank Mr. BUCKLEY for his most cooperative attitude over the past 2 months. Since the first week of October, I have been in contact with him numerous times over certain interpretations of the law.

There was some thought given to deferring the effective date of the law, but we, after numerous discussions decided on a series of amendments which will amend the law so that parents, students, and institutions could better interpret the provisions and exercise their rights under them.

Senator BUCKLEY and I have spent many hours working over the specific language changes. These amendments are not intended to deal with every single issue which has been raised. I fully expect that as students and institutions attempt to deal with the amended law further questions could arise. The Subcommittee on Education could well have oversight hearings on this matter next year after the law has been in operation.

In any event, I again thank Senator BUCKLEY for his actions on this matter.

I ask unanimous consent to have printed in the RECORD the document I have referred to.

There being no objection, the document was ordered to be printed in the RECORD, as follows:

CHANGES IN EXISTING LAW

PROTECTION OF THE RIGHTS AND PRIVACY OF PARENTS AND STUDENTS

SEC. 438. (a) (1) No funds shall be made available under any applicable program to any [State or local educational agency, any institution of higher education, any community college, any school, agency offering a preschool program, or any other educational institution] *educational agency or institution* which has a policy of denying, or which effectively prevents, the parents of students [attending any school of such agency, or attending such institution of higher education, community college, school, preschool, or other educational institution,] *who are or have been in attendance at a school of such agency or at such institution,* as the case may be the right to inspect and review [any and all official records, files, and data directly related to their children, including all material that is incorporated into each student's cumulative record folder, and intended for school use or to be available to parties outside the school or school system, and specifically including, but not necessarily limited to, identifying data, academic work completed, level of achievement (grades, standardized achievement test scores,) at-tendance data, scores on standardized intelligence, aptitude, and psychological tests, interest inventory results, health data, family background information, teacher or counselor ratings and observations, and verified reports of serious or recurrent behavior patterns,] *the education records of their children.* [Where such records or data include] *If any material or document in the education record of a student includes* information on more than one student, the parents of [any student shall be entitled to receive, or be informed of, that part of such record or data as pertains to their child.] *one of such students shall have the right to inspect and review only such part of such material or document as relates to such student or to be informed of the specific information contained in such part of such material. Each* [recipient] *educational agency or institution* shall establish appropriate procedures for the granting of a request by parents for access to [their child's school records] *the education records of their children* within a reasonable period of time, but in no case more than forty-five days after the request has been made.

(B) The first sentence of subparagraph (A) shall not operate to make available to students in institutions of postsecondary education the following materials:

(i) financial records of the parents or the student or any information contained therein;

(ii) confidential letters and statements of recommendation, which were placed in the education records prior to January 1, 1975, if such letters or statements are not used for purposes other than those for which they were specifically intended;

(iii) if the student has signed a waiver of the student's right of access under this subsection in accordance with subparagraph (C), confidential recommendations—

(I) respecting admission to any educational agency or institution,

(II) respecting an application for employment, and

(III) respecting the receipt of an honor or honorary recognition; and

(C) A student or a person applying for admission may waive his right of access to confidential statements described in clause (iii) of subparagraph (B), except that such waiver shall apply to recommendations only if (i) the student is, upon request, notified of the names of all persons making confidential recommendations and (ii) in the case of recommendations described in clause (iii) of such subparagraph, such recommendations are used solely for the purpose for which they were specifically intended.

(2) [Parents shall have an opportunity for a hearing to challenge the content of their child's school records.] *No funds shall be made available under any applicable program to any educational agency or institution unless the parents of students who are or have been in attendance at a school of such agency or at such institution are provided an opportunity for a hearing by such agency or institution, in accordance with regulations of the Secretary, to challenge the content of such student's education records, in order to insure that the records are not inaccurate, misleading, or otherwise in violation of the privacy or other rights of students, and to provide an opportunity for the correction or deletion of any such inaccurate, misleading, or otherwise inappropriate data contained therein and to insert into such records a written explanation of the parents respecting the content of such records.*

(3) For the purposes of this section the term "educational agency or institution" means any public or private agency or institution which is the recipient of funds under any applicable program.

(4) (A) For the purposes of this section, the

term "education records" means, except as may be provided otherwise in subparagraph (B), those records, files, documents, and other materials which—

(i) contain information directly related to a student; and

(ii) are maintained by an educational agency or institution, or by a person acting for such agency or institution.

(B) The term "education records" does not include—

(i) records of instructional, supervisory, and administrative personnel and educational personnel ancillary thereto which are in the sole possession of the maker thereof and which are not accessible or revealed to any other person except a substitute;

(ii) if the personnel of a law enforcement unit do not have access to education records under subsection (b)(1), the records and documents of such law enforcement unit which (I) are kept apart from records described in subparagraph (A), (II) are maintained solely for law enforcement purposes, and (III) are not made available to persons other than law enforcement officials of the same jurisdiction;

(iii) in the case of persons who are employed by an educational agency or institution but who are not in attendance at such agency or institution, records made and maintained in the normal course of business which relate exclusively to such person in that person's capacity as an employee and are not available for use for any other purpose; or

(iv) records on a student who is 18 years of age or older, or is attending an institution of postsecondary education, which are created or maintained by a physician, psychiatrist, psychologist, or other recognized professional or para-professional acting in his professional or para-professional capacity, or assisting in that capacity, and which are created, maintained, or used only in connection with the provision of treatment to the student, and are not available to anyone other than persons providing such treatment; provided, however, that such records can be personally reviewed by a physician or other appropriate professional of the student's choice.

(C) Nothing in this section shall be construed to alter the confidentiality of communications otherwise protected by law as confidential.

(5)(A) For the purposes of this section the term "directory information" relating to a student includes the following: the student's name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received, and the most recent previous educational agency or institution attended by the student.

(B) Any educational agency or institution making public directory information shall give public notice of the categories of information which it has designated as such information with respect to each student attending the institution or agency and shall allow a reasonable period of time after such notice has been given for a parent to inform the institution or agency that any or all of the information designated should not be released without the parent's prior consent.

(6) For the purposes of this section, the term "student" includes any person with respect to whom an educational agency or institution maintains education records or personally identifiable information, but does not include a person who has not been in attendance at such agency or institution.

"(b)(1) No funds shall be made available under any applicable program to any [State or local educational agency, any institution of higher education, any community college, any school, agency offering a preschool program, or any other educational institution]

CXX——2513—Part 30

educational agency or institution which has a policy or practice of permitting the release or [personally identifiable records or files (or personal information contained therein)] education records (or personally identifiable information contained therein other than directory information, as defined in paragraph (5) of subsection (a)) of students without the written consent of their parents to any individual, agency, or organization, other than to the following—

(A) other school officials, including teachers within the educational institution or local educational agency [who], who have been determined by such agency or institution to have legitimate educational interests;

(B) officials of other schools or school systems in which the student seeks or, intends to enroll, upon condition that the student's parents, be notified of the transfer, receive a copy of the record if desired, and have an opportunity for a hearing to challenge the content of the record;

(C) authorized representatives of (i) the Comptroller General of the United States, (ii) the Secretary, (iii) an administrative head of an education agency (as defined in section [409] 408(c) of this Act), or (iv) State educational authorities, under the conditions set forth in paragraph (3) of this subsection; and

(D) in connection with a student's application for, or receipt of, financial aid;

(E) State and local officials or authorities to which such information is specifically required to be reported or disclosed pursuant to State statute;

(F) organizations of educational agencies or institutions for the purpose of developing, validating, and administering predictive tests, if such information will not permit the identification of any person by the organization receiving such information;

(G) accrediting organizations in order to carry out their accrediting functions;

(H) parents of a dependent student of such parents, as defined in section 152 of the Internal Revenue Code of 1954; and

(I) subject to regulations of the Secretary, in connection with an emergency, appropriate persons if the knowledge of such information is necessary to protect the health or safety of the student or other persons.

(2) No funds shall be made available under any applicable program to any [State or local educational agency, any institution of higher education, any community college, any school, agency offering a preschool program, or any other educational institution] education agency or institution which has a policy or practice of [furnishing, in any form, any personally identifiable information contained in personal school records, to any present other than those listed in subsection (b)(1)] releasing, or providing access to, any personally identifiable information in education records other than directory information, or as is permitted under paragraph (1) of this subsection unless—

(A) there is written consent from the student's parents specifying records to be released, the reasons for such release, and to whom, and with a copy of the records to be released to the student's parents and the student if desired by the parents, or

(B) such information is furnished in compliance with judicial order, or pursuant to any lawfully issued subpoena, upon condition that parents and the students are notified of all such orders or subpoenas in advance of the compliance therewith by the educational institution or agency.

(3) Nothing contained in this section shall preclude authorized representatives of (A) the Comptroller General of the United States, (B) the Secretary, (C) an administrative head of an education agency or (D) State educational authorities from having access to student or other records which may be necessary in connection with the audit

and evaluation of Federally supported education program, or in connection with the enforcement of the Federal legal requirements which relate to such programs: Provided, That, except when collection of personally identifiable data is specifically authorized by Federal law, any data collected by such officials with respect to individual students shall not include information (including social security numbers) which would permit the personal identification of such students or their parents [after the data so obtained has been collected] by such officials or agencies.

[(4)(A) With respect to subsections (c)(1) and (c)(2) and (c)(3), all persons, agencies, or organizations desiring access to the records of a student shall be required to sign a written form which shall be kept permanently with the file of the student, but only for inspection by the parents or student, indicating specifically the legitimate educational or other interest that each person, agency, or organization has in seeking this information. Such form shall be available to parents and to the school official responsible for record maintenance as a means of auditing the operation of the system.]

(4)(A) Each educational agency or institution shall maintain a record, kept with the education records of each student, which will indicate all individuals (other than those specified in paragraph (1)(A) of this subsection), agencies, or organizations which have requested or obtained access to a student's education records maintained by such educational agency or institution, and which will indicate specifically the legitimate interest that each such person, agency, or organization has in obtaining this information. Such record of access shall be available only to parents, to the school official and his assistants who are responsible for the custody of such records, and to persons or organizations authorized in, and under the conditions of, clauses (A) and (C) of paragraph (1) as a means of auditing the operation of the system.

(B) With respect to this subsection, personal information shall only be transferred to a third party on the condition that such party will not permit any other party to have access to such information without the written consent of the parents of the student.

(c) The Secretary shall adopt appropriate regulations to protect the rights of privacy of students and their families in connection with any surveys or data-gathering activities conducted, assisted, or authorized by the Secretary or an administrative head of an education agency. Regulations established under this subsection shall include provisions controlling the use, dissemination, and protection of such data. No survey or data-gathering activities shall be conducted by the Secretary, or an administrative head of an education agency under an applicable program, unless such activities are authorized by law.

(d) For the purposes of this section, whenever a student has attained eighteen years of age, or is attending an institution of postsecondary education the permission or consent required of and the rights accorded to the parents of the student shall thereafter only be required of and accorded to the student.

(e) No funds shall be made available under any applicable program [unless the recipient of such funds] to any educational agency or institution unless such agency or institution informs the parents of students, or the students, if they are eighteen years of age or older, or are attending an institution of postsecondary education, of the rights accorded them by this section.

(f) The Secretary, or an administrative head of an education agency, shall take appropriate actions to enforce provisions of this section and to deal with violations of this

CONGRESSIONAL RECORD — SENATE

*December 13, 1974*

section, according to the provisions of this Act, except that action to terminate assistance may be taken only if the Secretary finds there has been a failure to comply with the provisions of this section, and he has determined that compliance cannot be secured by voluntary means.

(g) The Secretary shall establish or designate an office and review board within the Department of Health, Education, and Welfare for the purpose of investigating, processing, reviewing, and adjudicating violations of the provisions of this section and complaints which may be filed concerning alleged violations of this section [according to the procedures contained in sections 434 and 437 of this Act]. *Except for the conduct of hearings, none of the functions of the Secretary under this section shall be carried out in any of the regional offices of such Department.*

The PRESIDING OFFICER. The question is on agreeing to the amendment of the Senator from New York and the Senator from Rhode Island.

The amendment was agreed to.

The PRESIDING OFFICER. The question is on agreeing to the motion of the Senator from Rhode Island to concur in the House amendment with an amendment.

The motion was agreed to.

Mr. PELL. Mr. President, I move that the Senate insist upon its amendments and ask for a conference with the House, and that the Chair be authorized to appoint the conferees on the part of the Senate.

The motion was agreed to; and the Presiding Officer (Mr. WILLIAMS) appointed Mr. PELL, Mr. RANDOLPH, Mr. WILLIAMS, Mr. KENNEDY, Mr. MONDALE, Mr. EAGLETON, Mr. CRANSTON, Mr. HATHAWAY, Mr. DOMINICK, Mr. JAVITS, Mr. SCHWEIKER, Mr. BEALL, and Mr. STAFFORD conferees on the part of the Senate.

## SUPPLEMENTAL APPROPRIATIONS, 1975—CONFERENCE REPORT

The Senate continued with the consideration of the report of the committee of conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H.R. 16900) making supplemental appropriations for the fiscal year ending June 30, 1975, and for other purposes.

## CLOTURE MOTION

Mr. ROBERT C. BYRD. Mr. President, I send to the desk a cloture motion.

The PRESIDING OFFICER (Mr. WILLIAMS). The cloture motion having been presented under rule XXII, the Chair, without objection, directs the clerk to read the motion.

The legislative clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of Rule XXII of the Standing Rules of the Senate, hereby move to bring to a close the debate upon the amendment to the bill to the House Amendment No. 17 to H.R. 16900, the Supplemental Appropriation Bill for 1975.

Pete Domenici, Robert Taft, Jr., Robert T. Stafford, Charles Percy, James B. Pearson, Jacob K. Javits, Hugh Scott, Clifford P. Case, Jennings Randolph, John O. Pastore, Warren G. Magnuson, Frank E. Moss, Claiborne Pell, Harrison A. Williams, Abraham Ribicoff, Frank Church, Quentin N. Burdick, Walter F. Mondale, Alan Cranston.

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that the 1 hour under rule XXII tomorrow customarily used for debate on the motion to invoke cloture, on the Scott amendment to the amendment in disagreement No. 17 of the Supplemental Appropriation conference report, be equally divided between the Senator from Alabama (Mr. ALLEN) and the Senator from Pennsylvania (Mr. HUGH SCOTT).

The PRESIDING OFFICER. Without objection, it is so ordered.

## AMENDMENT OF THE EXPORT-IMPORT BANK ACT—CONFERENCE REPORT

The Senate continued with the consideration of the report of the committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 15977) to amend the Export-Import Bank Act of 1945, and for other purposes.

## CLOTURE MOTION

Mr. ROBERT C. BYRD. Mr. President, I send to the desk a cloture motion.

The PRESIDING OFFICER (Mr. WILLIAMS). The cloture motion having been presented under rule XXII, the Chair, without objection, directs the clerk to read the motion.

The legislative clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of Rule XXII of the Standing Rules of the Senate, hereby move to bring to a close the debate upon the adoption of the conference report on H.R. 15977, the Export-Import Bank Act Amendment.

Bob Packwood, John Tower, Edward W. Brooke, Paul J. Fannin, J. Glenn Beall, Adlai Stevenson, Thomas J. McIntyre, Walter F. Mondale, Dick Clark, Frank E. Moss, Lee Metcalf, Daniel Inouye, Gale W. McGee, Harrison A. Williams, Claiborne Pell, Edward Kennedy, Robert Stafford, Robert Taft, Jr., Charles W. Percy, Jacob K. Javits.

## ORDER TO HOLD RESOLUTIONS ON DEFERRALS AT THE DESK

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that two resolutions at the desk on deferrals, one by Mr. BENNETT and one by Mr. HUMPHREY, be held at the desk for later disposition. I further request that the later disposition not be had without my having first been contacted.

The PRESIDING OFFICER. Without objection, it is so ordered.

## COMMITTEE MEETINGS DURING SENATE SESSIONS

Mr. ROBERT C. BYRD. Mr. President, on behalf of the Senator from Michigan (Mr. HART) I ask unanimous consent that the Subcommittee on Administrative Practices of the Committee on the Judiciary be authorized to conduct hearings on amnesty on Wednesday and Thursday, December 18 and 19.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. ROBERT C. BYRD. I ask unanimous consent that the Committee on the Judiciary be authorized to meet on Thursday, December 19, to consider various nominations, and that the Committee on the Budget be authorized to meet Tuesday, December 17, Wednesday, December 18, and Thursday, December 19, to consider the impact of the changing economy on appropriate fiscal policies.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that the Committee on the Judiciary be authorized to meet on Monday, December 16, to consider the nomination of Murray Saltzman to be a member of the Commission on Civil Rights.

The PRESIDING OFFICER. Without objection, it is so ordered.

## CONSIDERATION OF CERTAIN MEASURES ON THE CALENDAR

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that the Senate proceed to the immediate consideration of the following measures on the calendar: Calendar Order No. 1248, Calendar Order No. 1264, Calendar Order No. 1266, Calendar Order No. 1267, Calendar Order No. 1270, and Calendar Order No. 1272.

The PRESIDING OFFICER. Without objection, it is ordered.

## CHILDREN'S GIFT BELL MEMORIAL

The Senate proceeded to consider the joint resolution (S.J. Res. 212) to authorize the erection of a Children's Gift Bell and Memorial Tower in the District of Columbia, and for other purposes, which had been reported from the Committee on Public Works with an amendment to strike out all after the resolving clause and insert in lieu thereof:

That the American Freedom Train Foundation is authorized to erect a Children's Gift Bell memorial bell tower of appropriate design on public grounds in the District of Columbia or its environs, in honor of the bicentennial celebration of the signing of the Declaration of Independence.

SEC. 2. (a) The Secretary of the Interior is authorized and directed to select, with the approval of the National Commission of Fine Arts and the National Capital Planning Commission, a suitable site on public grounds in the District of Columbia, or its environs, upon which may be erected the memorial authorized in the first section of this Act: *Provided,* That if the site selected is on public grounds belonging to or under the jurisdiction of the government of the District of Columbia, the approval of the Mayor and City Council of the District of Columbia shall be obtained.

(b) The design and plans for such memorial bell tower shall be subject to the approval of the Secretary of the Interior, the National Commission of Fine Arts, and the National Capital Planning Commission.

SEC. 3. The memorial authorized to be erected by the first section of this Act shall be erected without expense to the United States and shall be maintained by the Secretary of the Interior.

SEC. 4. The authority granted by the first section of this Act shall terminate three

# EXHIBIT 49

**2336 Immokalee Road**
**Naples, FL 34110**
**Phone:  239.229.8481**
**Fax:  239.449.3397**
**Email: drdiana@dianamclaughlin.com**



<span style="color:#e8822a">Diana</span> <span style="color:#7a2e2e">M.D.</span>
<span style="color:#2e5e8a">McLaughlin</span><span style="color:#2e5e8a">M.B.A.</span>
<span style="color:#3a7a3a">Esq.</span>

*<span style="color:#7a2e2e">Medicine</span> • <span style="color:#2e5e8a">Business</span> • <span style="color:#3a7a3a">Law</span>*

July 22, 2017


**DELIVERED VIA EMAIL TO**

Isis Carbajal de Garcia
Senior University Counsel
Florida International University
Modesto Maidique Campus PC 511
Miami, FL  33199

Re:  Christina M. McLaughlin

Dear Ms. Carbajal,

This correspondence serves to notify you that the FERPA student records you made available are incomplete.  The following is a list of missing documents and items.


Fall Semester:
CONSTITUTIONAL LAW:  Prof. Baker
**\*Constitutional Law Case Brief Presentation 1** (September 2016)
**\*Constitutional Law Extra Credit Paper** (October 2016)
**\*Constitutional Law Case Brief Presentation 2** (October 2016)
**\*Constitutional Law Comparative International Law Essay** (November 2016) Graded
Constitutional Law Comparative International Law Essay (November 2016) Rubric
**\*Constitutional Law Final Exam Scantron answers 60 through 100** (December 2016)
**\*Constitutional Law Final Exam Answer Key 1 through 100.** (December 2016)
Constitutional Law Final Grade Numerical
Constitutional Law Final Grade Curved

LSVI:  Prof. Schrier
**\*LSVI Discussion Draft** (September 2016) Graded
LSVI Discussion Draft (September 2016) Rubric
**\*LSVI Closed Memo** (October 2016) Graded
LSVI Closed Memo (October 2016 Rubric
**\*LSVI Research Assignment** (October 2016) Graded
LSVI Open Memo Final (November 2016) Rubric
LSVI Oral Report (November) Rubric
LSVI Final Grade Numerical
LSVI Final Grade Curved

CONTRACTS: Prof. Norberg
**\*Contract Final Examination** (December 2016) Graded
Contract Final Examination (December 2016) Rubric
Contract Final Grade Numerical
Contracts Final Grade Curved

TORTS: Prof. Jalloh
Torts Final Examination Answer Key
Torts Final Grade Numerical
Torts Final Grade Curved

Spring Semester:
CIVIL PROCEDURE:  Prof. Wasserman
**\*Civil Procedure Essay 5** (February 2017) Graded
Civil Procedure Essay 5 (February 2017) Rubric
**\*Civil Procedure Midterm** (March 2017) Graded
Civil Procedure Midterm (March 2017) Rubric
**\*Civil Procedure Extra Credit** (April 2017) Graded
Civil Procedure Final Grade Numerical
Civil Procedure Final Grade Curved

CRIMINAL LAW:  Prof. Carpenter
**\*Criminal Law Midterm Exam 1** (March 2017) Graded
Criminal Law Midterm Exam 1 (March 2017) Rubric
**\*Criminal Law Midterm 2** (April 2017) Graded
Criminal Law Midterm 2 (April 2017) Rubric
Criminal Law Final Exam Answer Key (May 2017)
Criminal Law Final Exam (May 2017) Rubric
Criminal Law Final Grade Numerical
Criminal Law Final Grade Curved

INTRODUCTION TO INTERNATIONAL AND COMPARATIVE LAW
Intro International Law Final (May 2017) Answer Key
Intro International Law Final Grade Numerical
Intro International Law Final Grade Curved

PROPERTY LAW: Prof. Rodriguez-Dod
Property Law Final Exam Answer Key (May 2017)
Property Law Final Exam Rubric (May 2017)
Property Law Final Grade Numerical
Property Law Final Grade Curved

LSVII:  Prof. Brown
**\*LSVII Trial Memo** (February 2017) Graded
LSVII Trial Memo (February 2017) Rubric

**\*LSVII Appellate Draft** (March 2017) Graded
LSVII Appellate Draft (March 2017 Rubric
**\*LSVII Court Observation** (March 2017) Graded
LSVII Court Observation (March 2017) Rubric
**\*LSVII Final Brief** (April 2017) Graded
LSVII Final Brief (April 2017) Rubric
**\*LSVII Oral Argument** (April 2017) Grade
LSVII Oral Argument (April 2017) Rubric
**\*LSVII Oral Argument Video** (April 2017)
LSVII Final Grade Numerical
LSVII Final Grade Curved

There are 21 graded exams or assignment (**BOLDED** and asterisk) missing from her student record. You have failed to timely make available her entire student record under FERPA. You are in violation of FERPA. The delayed and incomplete student record has caused irreparable damage to Christina's summer internship, option to transfer, career, and future. Additionally, Christina was dismissed from law school solely on academic performance. She believes the grades are incorrect and is disputing their veracity. Obviously, ungraded scantrons are useless as to inquiry of the accuracy of her grades and again demonstrates FIU's obstructionist tactics. Christina is requesting the answer key for each exam and the assignment rubrics for all grades. Moreover, several of Christina's essay assignments are omitted from the records you sent.

Your statement calling Christina's grade appeal "alleged" is outrageous. A formal grade appeal was made on May 22, 2017 and delivered to Dean Ansah via email that same day or 3 months ago. We have a FEDEX receipt that Dean Ansah received the grade appeal and the appeal for reinstatement on May 23, 2017. The demand for a grade appeal was reinforced a second time in an email to Dean Ansah on May 23, 2017. (See Attached). On May 31, 2017, Professor Wasserman and the entire Academic Review Committee (ARC) acknowledged receiving and reading the grade appeal at the time of the reinstatement hearing. Professor Wasserman stated that the grade appeal would be disregarded because the Academic Review Committee had "**no jurisdiction**" over grade appeals. On June 26, 2017, I replied to your request for a copy of the grade appeal, informing you of the above-referenced facts via email, thus rendering your claims of my failure to respond to your request a patent falsehood. However, your persistent request for this document provides prima facie evidence no action was taken on this request. Additionally, with the exception of illegible grading spreadsheets, no graded assignments were returned from Christina's LSV II course, suggesting further attempts to suppress information regarding grades given by a first semester, adjunct professor who received uniformly dismal reviews from students.

Christina's formal grade appeal and reinstatement appeal should have been included in the FERPA student records. The fact that the grade appeal and reinstatement appeal is not included in the student records and your repeated request infers that FIU has either misplaced or destroyed Christina's formal appeal. Professor Wasserman was the last person to be in possession of the appeal at the time of the hearing. If FIU is not in possession of Christina's grade appeal and appeal for reinstatement, we will allege that Professor Wasserman intentionally destroyed the

grade appeal in furtherance of his malicious targeting of Christina for her political beliefs in violation of federal and state law. Conversely, should FIU confirm they are in possession of the request for review, we will assert FIU breached its fiduciary duty to Christina by taking life-altering action against her in the absence of thorough investigation of issues raised in her appeal.

The basis of Christina's original review request was supported by substantive and material facts. Christina's grade appeal was based on Professor Brown's actual written comments and evidence of Professor Brown's manipulation of the grading rubric to purposely give the lowest grade in the class. Professor Brown told Christina that she punitively deducted points from all categories regardless of the rubric. FIU and the ARC intentionally ignored the grade appeal and made no effort to investigate the LSV grade despite the fact that the ARC hearing was attended by two LSV professors and conducted on behalf of the school's acting dean. Professor Wasserman's statement that the ARC has no jurisdiction over grade review is ludicrous given the committee was convened on behalf of the dean with the intention of determining Christina's continued enrollment at FIU Law. Additionally, Dean Ansah and Professor Wasserman were notified that Christina was represented by counsel. Professor Wasserman abridged Christina's rights by refusing to permit me to attend the reinstatement hearing. He stated that "the committee voted not to let her attorney attend the hearing" and left me to wait in hallway. Professor Wasserman's and the ARC decision was unethical, likely reportable to the Florida Bar, and further reinforces our assertion FIU purposefully target Christina. It is incredulous that a law school, purportedly charged with training the next generations of advocates, would deny one of its own students the right to representation and due process. Combined with Professor Baker's in-class portrayal of Republicans, specifically Trump voters, being mentally disabled, most reasonable persons would certainly infer Christina was subjected to undue animus.

You have been personally notified of FIU's failure to give adequate attention to her grade appeal since June 26, 2017 (4 weeks) and have done nothing to remedy this crisis. You are well aware that a law student transferring to another law school as a 2L is impossible without being a student in good standing and have purposefully created a de facto foreclosure of Christina's legal career. Given Christina was dismissed for two hundredths of a point, without previous notice or the option of probation or mediation, your school's persistent unwillingness to review or investigate anything, combined with the above-referenced issues regarding the kangaroo court known as ARC, one can reasonably infer other motives were behind Christina's dismissal.

FIU has made a string of indefensible bad acts against Christina. FIU has consistently lacked transparency and has used ploys and tactics meant to harm Christina. FIU has consistently failed in its fiduciary duty to treat Christina with fairness and respect due a student. It is now clear to us that at least Prof. Wasserman. Prof. Brown, Prof. Baker, Prof. Shrier, and Prof. Norberg targeted Christina for being an active participant and supporter of the Republican Party and President Donald Trump. We allege that some and perhaps all those professors unmasked Christina's blind grading number and intentionally downgraded Christina's raw score on her exams. We have carefully reviewed the few documents provided in her student record. We are confident that Christina's academic performance will speak for itself. We are confident that a full discovery will reveal that Christina's 1L academic performance was in no way below 2.0 GPA. We are confident that FIU has committed violations of her constitutional rights and committed tortious acts. FIU has been placed on formal notice of material and legitimate

complaints of professor malfeasance.  As an attorney, it is your duty to read all of her exams and written materials yourself.  Govern yourself accordingly.

**Christina is requesting that all her grades be reviewed by an objective third party and that Christina's allegations be investigated immediately.**  Christina is giving FIU this final opportunity to make right these grievous and damaging actions.  FIU is obligated to find and address her formal grade appeal and investigate all her allegations.  We will not provide another copy of the extremely important formal appeal because it will be easily proved that FIU was in possession of that appeal for three months and took no action.   Professor Wasserman or another member of the law school should be in possession of the grade appeal.   If FIU takes no action, a copy of the grade appeal will be attached to our complaint when filed.  We reserve all rights under federal and state law.  We reserve the right to file a grievance under FERPA.

We demand her entire student record listed above by July 26, 2017 5 p.m.  We demand the corresponding grading rubrics and the answer keys for each exam and assignment.

Thank you for your immediate attention.

Very Truly Yours,

Diana McLaughlin, M.D., M.B.A., Esq.                Cc:  Christina M. McLaughlin
Florida Bar Number:  84479
2336 Immokalee Road
Naples, FL  34110
Phone: (239) 229-8481
Fax:  (239) 449-3397
Email: drdiana@dianamclaughlin.com



**Christina McLaughlin <cmcla012@fiu.edu>**

---

## Petition for Readmission
3 messages

---

**Christina McLaughlin** <cmcla012@fiu.edu>                    Tue, May 23, 2017 at 4:42 PM
To: tansah@fiu.edu
Bcc: Diana McLaughlin <drdiana@kidsmedicalcare.com>, hugh@kmcnetwork.com

Dean Ansah,

You are already in receipt of the attached letter of appeal in this email.  I sent the attached letter of appeal
yesterday through email, fax, and Federal Express.  I received a signed receipt of the mailed letter of
appeal the morning of May 23rd, 2017.  I am resending the letter in response to the email I received the
afternoon of May 23rd, 2017 providing the directions of the formal submission process of a petition for
readmission.  I formally request that I appear before the committee to review my petition for readmission.  I
formally request that my mother, Diana McLaughlin, Esq. be present during my appearance.

Please send me email confirmation upon receipt of my petition pursuant to the instructions in the email.  As
a reminder, I have a paid legal internship that begins June 2nd, 2017.  I am requesting that I receive a final
disposition before June 2nd, 2017.  I am available to appear before the committee at any time, with
reasonable notice, taking into consideration that I live in Naples, Florida.  I am, also, requesting that my
grade for Spring Semester LSV (LSVII) be reviewed and determined prior to my appearance before the
committee.

Respectfully submitted,

Christina McLaughlin

---

📄 **McLaughlin Petition of Appeal.pdf**
2041K

---

**Tawia Ansah** <tansah@fiu.edu>                              Tue, May 30, 2017 at 3:19 PM
To: Christina McLaughlin <cmcla012@fiu.edu>

**Tawia B. Ansah**
Acting Dean
Professor of Law
FIU College of Law
Modesto Maidique Campus
11200 SW 8 Street, RDB Hall 2024
Miami, FL  33199
Office 305-348-8004

---

**From:** Christina McLaughlin <cmcla012@fiu.edu>
**Date:** Tuesday, May 23, 2017 at 4:42 PM

**To:** Tawia Ansah <tansah@fiu.edu>
**Subject:** Petition for Readmission

[Quoted text hidden]

---

**Tawia Ansah** <tansah@fiu.edu>                          Tue, May 30, 2017 at 3:20 PM
To: Christina McLaughlin <cmcla012@fiu.edu>

Dear Ms. McLaughlin

We are in receipt of your petition.
Thank you.
T.A.


**Tawia B. Ansah**
Acting Dean
Professor of Law
FIU College of Law
Modesto Maidique Campus
11200 SW 8 Street, RDB Hall 2024
Miami, FL 33199
Office 305-348-8004

---

**From:** Christina McLaughlin <cmcla012@fiu.edu>
**Date:** Tuesday, May 23, 2017 at 4:42 PM
**To:** Tawia Ansah <tansah@fiu.edu>
**Subject:** Petition for Readmission

[Quoted text hidden]

# EXHIBIT 50

**2336 Immokalee Road**
**Naples, FL 34110**
**Phone:  239.229.8481**
**Fax:   239.449.3397**
**Email: drdiana@dianamclaughlin.com**



June 31, 2017     `Scriverner's error`
                  `Should be 7/31/2017`

**DELIVERED VIA EMAIL TO isisc@fiu.edu**

Isis Carbajal de Garcia
Senior University Counsel
Florida International University
Modesto Maidique Campus PC 511
Miami, FL  33199

Re:  Christina M. McLaughlin: In the matter of Academic Dismissal from FIU - School of Law

Dear Ms. Carbajal,

FIU continues its unrelenting bad acts against Christina McLaughlin.  You have failed to respond to Christina's serious allegations of malfeasance by FIU Law professors, Prof. Joycelyn Brown and Prof. Howard Wasserman.   You emailed that you would send a response on July 26, 2017 but we have received no response by you.  FIU continues to withhold FERPA student records for more than one month.

FIU, through its agents, you and Dean Ansah, continue to ignore the fact that no action has been taken to address Christina's lengthy and substantive LSV II grade appeal for the past 9 weeks.  FIU continues to disregard Christina's fact based allegation that Prof. Brown purposely disregarded and misapplied the grading rubric in all assignments out of bias and malice because of Prof. Brown's contempt for Christina's political beliefs.  In your July 18, 2017 email to me you referred to Christina's request for grade review as "alleged".  Since you provided her appeal letter in your latest set of student records, you have provided prime facie proof that FIU received her initial request for grade review, therefore, not "alleged."

**The grade appeal was written and delivered to Dean Ansah, the acting dean of the law school.**  Presumably, any grade review would be under the "jurisdiction" of the dean.  Therefore, Prof. Wasserman's statement that a grade review was outside the "jurisdiction" of the Academic Review Committee is absurd because Dean Ansah, Prof. Wasserman and the entire ARC was aware of the grade review request a full eight days prior to the hearing, yet chose to take no action.  In light of this knowledge, Prof. Wasserman's statements to Christina can only be viewed as a demonstration of his personal animus, purposefully obfuscating **Christina's review request sent directly to the dean**.  Nine weeks later, FIU has still taken no action on the grade review request in spite of knowing her request was more than "alleged," as you stated.  Combined with Prof. Wasserman's refusal to allow Christina's legal counsel to attend the ARC hearing, any

reasonable trier of fact would find it difficult to believe no animus or intent to railroad Christina existed.

FIU refuses to take corrective action despite having knowledge that Prof. Wasserman refused to accept a letter of representation; refused to allow Christina's counsel be present at the time of her Academic Review Committee hearing; treated Christina's with aggression and disdain during the hearing; and denied Christina's request for a grade appeal.  Prof. Wasserman is a well-known and self-proclaimed anti-Trump crusader, whose vitriol and disdain for republicans and conservative beliefs is on constant public display.  Prof. Wasserman's numerous bad acts against Christina can be subsumed to his retaliation for Christina's active and deep commitment and support of the Republican Party, its candidates and President Donald Trump.

FIU could have simply and timely responded to Christina's concerns by transparently and forthrightly seeking an objective LSV II grade review.  FIU could have promptly and eagerly provided all of Christina's student records.  Rather, we have had to make multiple requests and get only small portions of her entire record in drips and drabs.  FIU could have investigated her legitimate complaints by requesting a meeting with Christina and giving the opportunity to state, in her own words, her experience with the hostile educational environment she faced at the law school and the antagonism of the appeals hearing.

Alternatively, FIU has stalled, diverted and disregarded a graduate student's substantive and factual complaints.  FIU is aware that if Christina's academic dismissal is without basis and a result of tortious actions, that Christina will suffer irreparable harm such that will affect her career trajectory and entire career earning potential.  Christina has already suffered a career set-back by losing an important summer paid internship.  She had to suffer severe embarrassment in the face of senior attorneys who facilitated her summer internship.  Christina was never given a financial aid exit interview and may suffer financial hardship because of student loans.  FIU's delay has caused Christina to lose her Miami housing because of the ensuing uncertainty.  FIU is aware that it is impossible to transfer to another law school as a 2L without being a student in good standing. FIU has avoided any reasonable and proper response to perpetuate and cover-up FIU law schools tortious acts.

FIU Law School's fall semester starts in 14 days.  There is no plausible or reasonable excuse to continue to ignore Christina's complaint of malfeasance nor continue to unreasonably withhold portions of Christina's academic records.  Below is a list of the student records still outstanding.  We expect a response and all her student records no later than August 2, 2017 at 5:00 p.m.

Fall Semester:
CONSTITUTIONAL LAW:  Prof. Baker
**Constitutional Law Case Brief Presentation 1** (September 2016)
**Constitutional Law Extra Credit Paper** (October 2016)
**Constitutional Law Case Brief Presentation 2** (October 2016)
Constitutional Law Comparative International Law Essay (November 2016) Rubric
**Constitutional Law Final Exam 1 through 100- Answer Key.** (December 2016)
Constitutional Law Final Grade Numerical

Constitutional Law Final Grade Curved

<u>LSVI:  Prof. Schrier</u>
**\*LSVI Discussion Draft** (September 2016) Graded
LSVI Discussion Draft (September 2016) Rubric
**\*LSVI Closed Memo** (October 2016) Graded
LSVI Closed Memo (October 2016 Rubric
**\*LSVI Research Assignment** (October 2016) Graded
LSVI Oral Report (November) Rubric
LSVI Final Grade Curved

<u>CONTRACTS: Prof. Norberg</u>
Contract Final Examination (December 2016) Rubric
Contracts Final Grade Curved

<u>TORTS: Prof. Jalloh</u>
Torts Final Examination Answer Key
Torts Final Grade Numerical
Torts Final Grade Curved

Spring Semester:
<u>CIVIL PROCEDURE:  Prof. Wasserman</u>
**\*Civil Procedure Essay 5** (February 2017) Graded
Civil Procedure Essay 5 (February 2017) Rubric
**\*Civil Procedure Midterm** (March 2017) Graded
Civil Procedure Midterm (March 2017) Rubric
Civil Procedure Final Grade Numerical
Civil Procedure Final Grade Curved

<u>CRIMINAL LAW:  Prof. Carpenter</u>
**\*Criminal Law Midterm Exam 1** (March 2017) Graded
Criminal Law Midterm Exam 1 (March 2017) Rubric
**\*Criminal Law Midterm 2** (April 2017) Graded
Criminal Law Midterm 2 (April 2017) Rubric
Criminal Law Final Exam Answer Key (May 2017)
Criminal Law Final Exam (May 2017) Rubric
Criminal Law Final Grade Numerical
Criminal Law Final Grade Curved

<u>INTRODUCTION TO INTERNATIONAL AND COMPARATIVE LAW</u>
Intro International Law Final (May 2017) Answer Key
Intro International Law Final Grade Numerical
Intro International Law Final Grade Curved

<u>PROPERTY LAW: Prof. Rodriguez-Dod</u>
Property Law Final Exam Answer Key (May 2017)

Property Law Final Exam Rubric (May 2017)
Property Law Final Grade Numerical
Property Law Final Grade Curved

<u>LSVII:  Prof. Brown</u>
**\*LSVII Trial Memo** (February 2017) Graded
LSVII Trial Memo (February 2017) Rubric
**\*LSVII Appellate Draft** (March 2017) Graded
LSVII Appellate Draft (March 2017 Rubric
**\*LSVII Court Observation** (March 2017) Graded
LSVII Court Observation (March 2017) Rubric
**\*LSVII Final Complete Brief** (April 2017) Graded
LSVII Final Brief (April 2017) Rubric
**\*LSVII Oral Argument** (April 2017) Grade
LSVII Oral Argument (April 2017) Rubric
**\*LSVII Oral Argument Video** (April 2017)
LSVII Final Grade Numerical
LSVII Final Grade Curved


Thank you for your immediate attention to this matter.


Very Truly Yours,

DIANA MCLAUGHLIN, M.D., M.B.A., Esq.
Florida Bar Number:  84479
2336 Immokalee Road
Naples, FL  34110
Phone: (239) 229-8481
Fax:   (239) 449-3397
Email: drdiana@dianamclaughlin.com

# EXHIBIT 51

# Re: FPCO Complaint 18-0184; FPCO Complaint 2067

Hawes, Michael <Michael.Hawes@ed.gov>

Wed 4/24/2019 8:31 PM

To: Diana McLaughlin <dianamclaughlin@dianamclaughlin.com>;

You are at the top of my list!

Sent from my iPad.

_____

Michael B. Hawes
Director, Student Privacy Policy Office
U.S. Department of Education
Michael.Hawes@ed.gov

On Apr 24, 2019, at 6:28 PM, Diana McLaughlin <dianamclaughlin@dianamclaughlin.com> wrote:

Are we still one of the top 5 cases you are working on?

_____

**From:** Hawes, Michael <Michael.Hawes@ed.gov>
**Sent:** Wednesday, April 24, 2019 2:50 PM
**To:** Diana McLaughlin
**Subject:** RE: FPCO Complaint 18-0184; FPCO Complaint 2067

Dr. McLaughlin,

Please forgive the tardiness of my reply to your email, I was out of the office Monday and Tuesday.

Your daughter's investigation is still under review by our General Counsel's office, but I did receive word this morning that there has been movement on the case.  I will let you know as soon as we are able to issue the findings letter.

-Michael

_____

*Michael B. Hawes*

*Director, Student Privacy Policy Office*

*Office of Planning, Evaluation, and Policy Development*

*U.S. Department of Education*

*Michael.Hawes@ed.gov*

---

**From:** Diana McLaughlin <dianamclaughlin@dianamclaughlin.com>
**Sent:** Monday, April 22, 2019 10:18 AM
**To:** Hawes, Michael <Michael.Hawes@ed.gov>
**Subject:** RE: FPCO Complaint 18-0184; FPCO Complaint 2067

Dear Mr. Hawes,

Would you please update me on the status of this investigation?

Diana McLaughlin, M.D., Esq.

---

**From:** Hawes, Michael < Michael.Hawes@ed.gov>
**Sent:** Friday, March 22, 2019 3:31 PM
**To:** Diana McLaughlin
**Subject:** RE: FPCO Complaint 18-0184; FPCO Complaint 2067

Dr. McLaughlin,

I apologize for the delay, but we are still working through some issues regarding your daughter's case with our General Counsel's office.  I hope to have more news soon.

-Michael

_____

Michael Brewster Hawes

Director, Student Privacy Policy Office

Office of Planning, Evaluation, and Policy Development

U.S. Department of Education

202.453.7017

michael.hawes@ed.gov

_____

**From:** Diana McLaughlin [mailto:dianamclaughlin@dianamclaughlin.com]
**Sent:** Friday, March 22, 2019 3:28 PM
**To:** Hawes, Michael
**Subject:** RE: FPCO Complaint 18-0184; FPCO Complaint 2067

Dear Mr. Hawes,

Would you please update me on the status of this investigation?

Diana McLaughlin, M.D., Esq.

**From:** Hawes, Michael< Michael.Hawes@ed.gov>
**Sent:** Tuesday, January 8, 2019 10:28 AM
**To:** Diana McLaughlin
**Subject:** RE: FPCO Complaint 18-0184; FPCO Complaint 2067

Dr. McLaughlin,

Yes, I will call you at 4PM (Eastern) tomorrow afternoon.

_____

Michael B. Hawes

Director, Student Privacy Policy Office

Office of Planning, Evaluation, and Policy Development

U.S. Department of Education

202.453.7017

michael.hawes@ed.gov

_____

**From:** Diana McLaughlin [mailto:dianamclaughlin@dianamclaughlin.com]
**Sent:** Tuesday, January 08, 2019 10:18 AM
**To:** Hawes, Michael
**Subject:** RE: FPCO Complaint 18-0184; FPCO Complaint 2067

Good morning Mr. Hawes.  Just confirming if we still plan to speak tomorrow afternoon at 4:00 pm.  Please let me know.

Thanks,

Diana

_____

**From:** Hawes, Michael< Michael.Hawes@ed.gov>
**Sent:** Thursday, January 3, 2019 7:01 AM
**To:** Diana McLaughlin
**Subject:** Re: FPCO Complaint 18-0184; FPCO Complaint 2067

Dr. McLaughlin,

Yes, I was able to find the document.  Thanks.

Sent from my iPad

_____

Michael Brewster Hawes

Director of Student Privacy Policy, and

Acting Director, Family Policy Compliance Office

Office of the Chief Privacy Officer

U.S. Department of Education

202.453.7017

michael.hawes@ed.gov

On Jan 2, 2019, at 9:28 PM, Diana McLaughlin <dianamclaughlin@dianamclaughlin.com>
wrote:

Dear Mr. Hawes,

Happy New Year.  I wanted to follow up on our conversation last week.  Were you able to locate the FIU Academic Policies and Regulations?  If you have not, please let me know and I will forward you another copy.

Thank you for your consideration.

Diana McLaughlin, M.D., Esq.

# EXHIBIT 52



U.S. Department of Education
Office of Inspector General

# Office of the Chief Privacy Officer's Processing of Family Educational Rights and Privacy Act Complaints

November 26, 2018
ED-OIG/A09R0008

## NOTICE

Statements that managerial practices need improvements, as well as other conclusions and recommendations in this report, represent the opinions of the Office of Inspector General. The appropriate Department of Education officials will determine what corrective actions should be taken.

In accordance with Freedom of Information Act (Title 5, United States Code, Section 552), reports that the Office of Inspector General issues are available to members of the press and general public to the extent information they contain is not subject to exemptions in the Act.



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF INSPECTOR GENERAL**

Audit Services

November 26, 2018


TO:          Denise L. Carter
             Acting Assistant Secretary
             Office of Management

FROM:        Bryon Gordon /s/
             Assistant Inspector General for Audit

SUBJECT:     Final Audit Report, "Office of the Chief Privacy Officer's Processing of Family Educational
             Rights and Privacy Act Complaints," Control Number ED-OIG/A09R0008


Attached is the subject final audit report that consolidates the results of our review of the Office of the
Chief Privacy Officer's processing of Family Educational Rights and Privacy Act complaints. We have
provided an electronic copy to your audit liaison officer. We received your comments agreeing with the
finding and recommendations in our draft report.

U.S. Department of Education policy requires that you develop a final corrective action plan within
30 days of the issuance of this report. The corrective action plan should set forth the specific action
items and targeted completion dates necessary to implement final corrective actions on the finding and
recommendations contained in this final audit report. Corrective actions that your office proposes and
implements will be monitored and tracked through the Department's Audit Accountability and
Resolution Tracking System.

In accordance with the Inspector General Act of 1978, as amended, the Office of Inspector General is
required to report to Congress twice a year on the audits that remain unresolved after 6 months from
the date of issuance.

We appreciate your cooperation during this review. If you have any questions, please contact Ray
Hendren, Regional Inspector General for Audit, Sacramento Audit Region at (916) 930-2399 or
ray.hendren@ed.gov.

Attachment

## Table of Contents

Results in Brief ................................................................................................................. 5

Introduction ...................................................................................................................... 8

Finding. The Privacy Office Did Not Have Sufficient Controls to Ensure that it Timely and Effectively Processed FERPA Complaints ........................................................................ 12

Other Matter. The Privacy Office Should Conduct Self-Initiated Investigations When Warranted ...................................................................................................................... 31

Appendix A. Scope and Methodology ............................................................................... 32

Appendix B. Acronyms and Abbreviations ........................................................................ 37

Office of Management Comments ..................................................................................... 38

## Results in Brief

### What We Did

The objective of our audit was to determine whether the Office of the Chief Privacy Officer had controls to ensure that it timely and effectively processed complaints received under the Family Educational Rights and Privacy Act.

Our audit covered the U.S. Department of Education (Department), Office of the Chief Privacy Officer's (Privacy Office) processing of Family Educational Rights and Privacy Act (FERPA) complaints that were open for at least one day during fiscal year (FY) 2017, regardless of when the Privacy Office originally received the complaints. Processing of FERPA complaints refers to all actions that the Privacy Office has taken related to the complaints, including receiving, recording, reviewing, tracking, dismissing, investigating, and closing the complaints. We limited our scope to the complaint processing activities that the Privacy Office performed from the time it received the complaints through the end of FY 2017 (September 30, 2017). We also obtained information about changes that the Privacy Office made to its complaint processes during FY 2018 while the audit was underway.

We sampled 74 complaints from four categories: completed investigations, open investigations, inactive complaints, and dismissed complaints. We obtained and reviewed documentation of activity related to each sampled complaint, including the original complaint and correspondence associated with the processing of the complaint. We also obtained other relevant documentation and interviewed Privacy Office personnel to help us evaluate the timeliness and effectiveness of the Privacy Office's FERPA complaint processing.

### What We Found

The Privacy Office did not have controls to ensure that it timely and effectively processed FERPA complaints during our audit period. The Privacy Office had a longstanding and substantial backlog of unresolved FERPA complaints that prevented timely and effective resolution of new complaints it received. It also had a number of significant control weaknesses that hampered its ability to resolve FERPA complaints. Unresolved FERPA policy questions have also affected the Privacy Office's ability to resolve certain complaints. The Privacy Office placed many of these complaints into an indefinite inactive status as a result.

The Privacy Office could not precisely quantify the unresolved complaint backlog due to weaknesses in its tracking process, but Privacy Office officials estimated they were about 2 years behind on complaint investigations. Based on the number of open complaints that warrant investigation and the number of investigations the Privacy

Office completed in FY 2017 and part of FY 2018, we concluded that the backlog may be significantly greater than 2 years. According to one official, the Privacy Office has experienced an increase in both the volume and complexity of incoming FERPA complaints in recent years.

The Privacy Office had an opportunity to eliminate, or at least significantly reduce, the complaint backlog beginning in FY 2015 when it received authority to hire several additional staff for the student privacy function. Despite highlighting elimination of the significant complaint backlog as one of the primary benefits of increasing its staffing level, the Privacy Office dedicated the majority of the new staff it obtained to performing FERPA work unrelated to resolving existing complaints, such as providing technical assistance, training, and guidance on best practices. Although these other FERPA activities are important and can lead to fewer complaints in the future, it is critical that the Privacy Office focus its attention on eliminating or reducing the backlog to ensure it is meeting its legal obligation to timely and effectively resolve FERPA complaints and reduce the risks to students and the Department caused by substantial delays in resolving complaints. The Privacy Office does not have a plan to eliminate the complaint backlog despite characterizing the backlog as among its highest management priorities.

We also identified significant control weaknesses in how the Privacy Office designed and implemented processes for evaluating, tracking, and resolving FERPA complaints. These weaknesses contributed to the backlog and led to untimely and ineffective complaint processing. The Privacy Office's complaint tracking process and systems were inadequate and did not allow the Privacy Office to identify the number of individual complaints it had received or track the status of those complaints. As a result, the Privacy Office did not have reliable or complete data on its complaint resolution operations and could not set meaningful performance goals or evaluate its performance.

The Privacy Office did not have a consistent or appropriate complaint resolution process during our audit period. The Privacy Office placed some complaints that required an investigation into an inactive status. The Privacy Office also did not have current written policies and procedures to guide staff responsible for resolving complaints. It left many critical decisions to the discretion of individual caseworkers, and managers did not sufficiently oversee caseworker activity, which led to inconsistencies in complaint handling. The Privacy Office also did not always communicate effectively with complainants during the time that complaints were open. Finally, the Privacy Office generally processed complaints in the order they were received rather than evaluating the risk of each complaint and prioritizing complaints with the highest risk or greatest potential impact.

FERPA violations can have significant ramifications for students. Because of weaknesses in its FERPA complaint resolution processes, the Privacy Office did not ensure the timely remediation of violations, which may have compounded the adverse impact on students. For example, when a school inappropriately releases personal information[1] from a student's education record, the student can face consequences including a loss of reputation, harassment, and retaliation. Further, when a school denies a student the opportunity to access, review, and correct the information in their education record, the student can lose out on important educational or employment opportunities. Complainants rely on the Privacy Office to take prompt enforcement action on their complaints when warranted. The backlog and ineffective communication with complainants could also result in diminished public trust in the Department.

Privacy Office officials took certain actions during FY 2017 and into FY 2018 to improve their ability to timely and effectively resolve FERPA complaints. We evaluated the sufficiency and appropriateness of only those actions that were fully implemented during our audit period.

## What We Recommend

We recommend that the Acting Assistant Secretary of the Office of Management require the Privacy Office to take a variety of actions to address the complaint backlog and to correct the control weaknesses associated with its complaint resolution processes.

- The Privacy Office should allocate appropriate resources to eliminate the current unresolved complaint backlog so that it can resolve complaints in a timely manner going forward. The Privacy Office should also work to resolve FERPA policy issues that affect its ability to resolve certain complaints.

- To eliminate control weaknesses, the Privacy Office should ensure its policies and procedures are appropriate and comprehensive to effectively guide staff that resolve complaints as well as managers that oversee their work. The Privacy Office should also implement an effective complaint tracking process to ensure it can maintain reliable and complete information on the status and outcome of all complaints received. In addition, the Privacy Office should develop meaningful performance standards for the complaint resolution function and for staff that resolve complaints. The Privacy Office should also avoid putting

---

[1] We use the term "personal information" in this report to refer to "personally identifiable information" from a student's education record that is protected under FERPA. This could include information such as a student's grades, disciplinary history, or medical information.

complaints that warrant an investigation into an "inactive" status. Finally, the Privacy Office should ensure it communicates timely and effectively with complainants and develop a process for evaluating the risk of incoming complaints to ensure that high-risk or high-impact complaints are assigned the highest priority.

We provided a draft of this report to the Department's Office of Management, which oversees the Privacy Office, for comment. The Office of Management agreed with the finding and all recommendations and described corrective actions that it had taken or planned to take to address each of the recommendations. The Office of Management provided two factual clarifications related to specific information in the draft report. The Office of Management also stated that it could be perceived that the draft included material covered by attorney-client or deliberative process privileges. We revised the report based on the comments provided. The revisions did not change our finding, conclusions, or recommendations. We included the full text of the Office of Management's comments at the end of this report.

## Introduction

### Background

FERPA grants certain rights and privacy protections to parents and students regarding student education records. FERPA applies to all schools (elementary, secondary, and postsecondary) that receive Federal education funding under any applicable program administered by the Department, as well as to educational agencies such as school districts and State departments of education. For students under the age of 18, FERPA and the Department's implementing regulations afford privacy rights to parents with respect to their children's education records unless the student is attending a postsecondary school. Once a student turns 18 or attends a postsecondary school, only the student has FERPA privacy rights as an "eligible student."[2] The rights that FERPA affords include the right to review the student's education records maintained by the school, and to request that the school correct records that the parent or eligible student believes to be inaccurate, misleading, or that violate the student's rights to privacy. Parents and eligible students also have the right to file a complaint with the Department if they believe their FERPA rights have been violated.

---

[2] If a parent with FERPA rights files a complaint for their child, the parent will continue to maintain FERPA rights for that complaint even if the child turns 18 years of age or begins postsecondary school.

Schools generally must obtain written consent from the parent or eligible student before disclosing information from the student's education record. However, schools can release education records, or the personal information contained therein, without consent under certain circumstances, such as providing the records to a school official who has a legitimate educational interest in the information, to other schools to which the student is transferring, or to authorized officials in connection with an audit or judicial order. Schools can also disclose "directory information" (such as a student's name, address, phone number, and date and place of birth) without consent as long as they inform the parent or eligible student of their policy regarding directory information and allow a reasonable amount of time for them to opt out of sharing the directory information.

Under Title 20, U.S. Code, Section 1232g(f) and (g), the Department is required to establish an office for the purpose of investigating, processing, reviewing, and adjudicating FERPA violations and complaints of alleged FERPA violations and to take "appropriate actions" to enforce FERPA. Under Title 34, Code of Federal Regulations (C.F.R.), Section 99.60(b), the Department has designated the Privacy Office as the office responsible for enforcing FERPA, including investigating, processing, and reviewing complaints, and providing technical assistance to help ensure compliance with FERPA. The law and regulations generally do not specify how the Department should process complaints or establish timeframes for resolving complaints. Instead, the Privacy Office has discretion as to how it resolves FERPA complaints.

In addition to enforcing FERPA, the Privacy Office is also responsible for administering two other laws related to student privacy: the Protection of Pupil Rights Amendment and the military recruiter provisions of the Every Student Succeeds Act. However, Privacy Office officials told us that 95 percent or more of the Privacy Office's student privacy workload is related to FERPA. In addition to its work on student privacy, the Privacy Office administers other statutes for the Department, such as the Freedom of Information Act, the Privacy Act, the Federal Records Act, and the Paperwork Reduction Act.

The Family Policy Compliance Office (Compliance Office) within the Privacy Office is responsible for conducting FERPA compliance and enforcement activities, including processing and investigating FERPA complaints. Until 2017, the Compliance Office was formally responsible for all of the Privacy Office's activities related to FERPA. In January 2017, the Privacy Office created a new division called the Student Privacy Policy

and Assistance Division (Policy and Assistance Division).[3] The Policy and Assistance Division assumed responsibility for certain FERPA-related functions that the Compliance Office had previously performed. Table 1 shows the respective responsibilities of the Compliance Office and the Policy and Assistance Division.

**Table 1. FERPA Responsibilities of the Compliance Office and the Policy and Assistance Division**

| Activity | Compliance Office | Policy and Assistance Division |
|---|---|---|
| Complaint resolution and enforcement | Yes | No |
| Technical assistance (a) | Yes | Yes |
| Policy development and issuance of best practices guidance | No | Yes |
| FERPA compliance training and maintenance of studentprivacy.ed.gov | Yes | Yes |

(a)  In general, the Compliance Office provides technical assistance to parents and students and the Policy and Assistance Division provides technical assistance to educational agencies and schools.

FERPA complaints must be submitted to the Compliance Office in writing. The Compliance Office has a complaint form on its website that complainants can submit online or by mail or email. A FERPA complaint must meet the following three criteria to warrant an investigation by the Compliance Office:

1.  the complainant must have standing (be a parent or eligible student),

2.  the complaint must be timely (submitted to the Compliance Office within 180 days of the date of the alleged FERPA violation or the date that the complainant knew or reasonably should have known of the alleged violation), and

3.  the complaint must contain specific allegations of fact giving reasonable cause to believe that a FERPA violation may have occurred.

---

[3] The Compliance Office was the office designated by the Secretary at 34 C.F.R. Section 90.60 as responsible for FERPA until 2017 when the Privacy Office made a technical amendment to the C.F.R. to change the responsible office from the Compliance Office to the Privacy Office.

In January 2017, the Compliance Office began holding a weekly meeting (which it referred to as a "triage meeting") to evaluate each of the complaints that it received during the prior week. The Compliance Office director, deputy director, investigation caseworkers, and other appropriate staff participate in the triage meetings and use their collective knowledge to determine the proper course of action for each complaint. Generally, staff place complaints into one of three categories during the triage meeting: investigation, pending, or dismissal. If a complaint meets the criteria for investigation, the Compliance Office assigns an investigation number to the complaint and places it in a queue to be investigated. If the complaint does not include enough information for the Compliance Office to determine whether it warrants investigation, the complaint is classified as pending and the Compliance Office requests additional information from the complainant. If the complaint does not warrant investigation, it is dismissed.

FERPA complaints vary widely in subject matter and impact, ranging from specific issues related to one student's education record to systemic issues that affect every student at a school. For example, a parent or eligible student may file a FERPA complaint if a school denies them access to the student's education records or if a school declines to correct a mistake in the education records. An error in the student's education record, such as a missing course or incorrect grade, can affect the student's eligibility for graduation and employment. As another example, a parent or eligible student may file a complaint if the school shares the student's directory information despite the student having opted out. This type of prohibited disclosure would be significant if a student had a restraining order against someone who should not have access to the student's address or other personal information. Schools may also have policies or practices that systemically violate the FERPA rights of all students who attend the school. The underlying circumstances of FERPA complaints may have high stakes for the complainant and the scenarios can be time-sensitive, demanding prompt action by the Department to resolve the complaint.

In 2010, the Department hired a consultant to evaluate the Compliance Office's operations. The consultant identified 19 recommendations, including a number of suggestions for improving how the Compliance Office processed and resolved FERPA complaints. Since 2010, the Compliance Office has taken action to implement a number of the recommendations, but it has not fully implemented some critical recommendations related to tracking complaints and using data to measure performance. Beginning in FY 2017, the Compliance Office undertook a significant redesign and overhaul of its complaint resolution processes. As part of this initiative, the Compliance Office reviewed the backlog of all open complaints to determine the appropriate action for each complaint, modified and improved its complaint tracking processes, developed standard templates for letters it commonly issued during complaint resolution, and developed written policies and procedures.

The Department identified FERPA enforcement as a priority in its FY 2018–2022 Strategic Plan. Strategic objective 3.2 is to "[i]mprove privacy protections for, and transparency of, education data both at the Department and in the education community." Strategic objective 3.2 includes two implementation strategies, the second of which is to "[i]mprove the efficiency of the Department's administration, enforcement, and technical assistance relating to student privacy." This implementation strategy includes ensuring the timeliness of FERPA enforcement.

## Finding. The Privacy Office Did Not Have Sufficient Controls to Ensure that it Timely and Effectively Processed FERPA Complaints

The Privacy Office had and continues to have a longstanding backlog of unresolved FERPA complaints; Compliance Office officials estimated they were about 2 years behind on complaint investigations. However, based on the number of open complaints and the number of complaint investigations that the Compliance Office has recently closed, we concluded that the backlog may be significantly greater than 2 years. Multiple factors contribute to the backlog, including a lack of resources to timely investigate all complaints and unresolved FERPA policy issues that impede complaint investigations. The Privacy Office had an opportunity to reduce or eliminate the complaint backlog beginning in FY 2015 when it received authority to hire additional staff for the student privacy function. However, despite the significant complaint backlog, the Privacy Office dedicated the majority of the new resources to performing FERPA work unrelated to resolving existing complaints.

We also identified a number of weaknesses in the Compliance Office's processes for resolving complaints. The Compliance Office's tracking process for FERPA complaints was inadequate and did not enable the Compliance Office to identify the number of individual complaints it had received or track the status of all complaints through the resolution process. As a result, the Compliance Office did not have reliable data on its effectiveness in resolving complaints and could not set meaningful performance goals or evaluate its performance. The Compliance Office's processes also lacked consistency and in some cases were not appropriate, in part because the Compliance Office had not implemented written policies and procedures to guide personnel. Many critical decisions were left to the discretion of caseworkers and managers did not sufficiently oversee the work, which led to inconsistency in complaint handling. The Compliance Office also did not always communicate effectively with complainants during the complaint resolution process. Finally, the Compliance Office generally processed complaints in the order they were received rather than evaluating the risk of each complaint and prioritizing the complaints with the highest risk or most significant potential adverse impact.

FERPA violations can have significant ramifications for students. Because of weaknesses in its FERPA complaint resolution processes, the Compliance Office did not ensure the timely remediation of violations, which may have compounded the adverse impact on students. For example, when a school inappropriately discloses personal information from a student's education record, the student can face consequences including a loss of reputation, harassment, and retaliation. Further, when a school denies a student the opportunity to access, review, and correct the information in their education record, the student can lose out on important educational or employment opportunities. Complainants rely on the Compliance Office to take timely enforcement action on their complaints when warranted. The backlog and ineffective communication with complainants could also result in diminished public trust in the Department.

The U.S. Government Accountability Office's "Standards for Internal Control in the Federal Government," September 2014, (known as the Green Book) establishes internal control standards for Federal entities. The Green Book identifies the following five components of internal control: control environment, risk assessment, control activities, information and communication, and monitoring. Each of the five components of internal control contains several principles which are the underlying requirements of the component. For an internal control system to be effective, the five components of internal control must all be effectively designed, implemented, and operating together in an integrated manner. The Privacy Office should correct the control weaknesses we identified to help ensure that its controls over the processing of FERPA complaints meet the standards of the Green Book.

## Unresolved Complaint Backlog

The Compliance Office had a significant backlog of FERPA complaints and the Chief Privacy Officer told us that the backlog has existed for decades. Compliance Office officials could not precisely quantify the complaint backlog due to weaknesses in the complaint tracking process (described further in the section "Complaint Tracking System was Inadequate"), but they estimated that the Compliance Office was about 2 years behind on FERPA investigations. According to Compliance Office officials, the average FERPA investigation takes about 24 hours of active staff time to complete, and the work is spread over a period of about 6 months. Thus, any complaint older than about 6 months would be considered part of the backlog.

The Compliance Office's records indicated that there were 285 open investigations at the end of September 2017.[4] By May 2018, the number of open investigations had increased to 344. These numbers include only the complaints that the Compliance Office has decided to investigate and do not include other open complaints, such as those in a pending status while the Compliance Office determines whether they warrant an investigation, or those that the Compliance Office has placed in an inactive status due to unresolved policy issues that impede the Compliance Office's ability to investigate them.

According to the Compliance Office's records, it completed and issued letters to close 24 investigations during FY 2017. Compliance Office officials told us that the number of investigations they completed in FY 2017 was lower than the number they completed in prior years for two reasons. First, there was a backlog resulting from delays in completing managerial reviews of letters to formally close investigations that had been completed in FY 2017. According to Compliance Office officials, they completed 31 additional investigations during FY 2017. However, the Compliance Office had not issued letters to close these 31 completed investigations nearly 8 months after the end of the fiscal year. Second, the Compliance Office dedicated a substantial amount of staff time to redesigning its operations during FY 2017. Compliance Office officials told us that staff shifted their focus from their regularly assigned work to help develop new policies and procedures and perform other redesign activities during the year. However, we noted that according to the Compliance Office's tracking spreadsheet updated in May 2018, the Compliance Office had closed only 17 investigations during FY 2018 (nearly 8 months into the year). This closed investigations count was comparable with the total number of investigations the Compliance Office closed during FY 2017. At this rate of closing investigations, the inventory of 344 open investigations would amount to a backlog of far greater than 2 years.

We reviewed all 24 investigations that the Compliance Office completed during FY 2017 and determined that the age of the complaints, calculated from the date that the Compliance Office received each complaint until the closure of the associated

---

[4] We identified relevant FERPA complaint populations—including the number of completed investigations, open investigations, dismissed complaints, and inactive complaints—to the extent possible given the available data. Because the Compliance Office's complaint tracking process had significant limitations, the populations we identified may not be entirely complete or accurate. See the "Sampling Methodology" section of the "Scope and Methodology" section of this report for additional details.

investigation, ranged from 1.1 years to 3.3 years.[5] The average age was 2.2 years. We also reviewed 20 of the 285 open investigations and found that the age of the investigations ranged from about 2 months to 4.8 years. We determined that 30 percent of the population of open investigations was more than 2 years old and 10 percent was more than 3 years old as of September 30, 2017. The oldest open investigation was more than 6 years old.

The Compliance Office had two distinct FERPA complaint backlogs. The first backlog was related to delays in processing complaints, including conducting the investigation (if necessary) and preparing draft correspondence for the complaint such as dismissal letters, investigation initiation letters, finding letters, or closure letters. The second backlog, as mentioned above, was the result of delays in Compliance Office management's review of the draft correspondence. In November 2017, the director and deputy director of the Compliance Office stated that they each had a backlog of correspondence awaiting their review that was at least 4 months old. By May 2018, the review backlog had grown to about 8 months. The delay in reviewing outgoing correspondence was at least partly caused by the transfer from the Compliance Office to the Policy and Assistance Division of an experienced staff member who had been responsible for reviewing the Compliance Office's outgoing letters. The Compliance Office's practice of having both the deputy director and the director of the Compliance Office review all outgoing correspondence before its release also contributed to the review backlog. Compliance Office officials told us that they streamlined the review process to increase efficiency in FY 2018 by having only the director or the deputy director review most correspondence items before issuance.

### Missed Opportunity to Reduce Complaint Backlog

The Privacy Office had an opportunity to significantly reduce or eliminate the longstanding unresolved complaint backlog beginning in FY 2015 when it was allowed to hire new staff to improve its administration of FERPA. Instead, the Privacy Office dedicated the majority of the new personnel to performing FERPA activities that were unrelated to complaint processing. The Privacy Office allocated just two new entry-level staff to assist the Compliance Office with complaint processing while also reassigning one of the Compliance Office's most experienced team members to perform activities unrelated to complaints.

---

[5] The results of our testing of sample complaints and investigations apply only to the items tested and cannot be projected to the population as a whole.

The Privacy Office received authorization in FY 2015 to hire five new Federal staff to perform FERPA-related activities. The Privacy Office requested six new Federal staff positions and six contractor positions in its FY 2015 budget request, which stated that it did not have the resources necessary to meet its legal obligations under FERPA. The Privacy Office asked for the additional resources so that it could reengineer the student privacy function to make it more effective. The Privacy Office's budget request outlined a number of benefits to be achieved with the additional staffing. The first benefit listed in the budget request was the elimination of the FERPA complaint backlog, which would bring the Privacy Office into compliance with its statutory obligations under FERPA.[6] The Privacy Office also planned to use the additional resources for a number of other initiatives related to student privacy, such as enhancing technical assistance and guidance, resolving longstanding policy issues, providing support for Department programs and priorities, and conducting self-initiated investigations of potential FERPA violations.

After receiving the authorization for five new positions, Privacy Office leadership decided to perform an internal reorganization to create the Policy and Assistance Division. After the reorganization, the Compliance Office retained responsibility for complaint investigations and providing technical assistance to parents and eligible students, while the Policy and Assistance Division assumed responsibility for providing technical assistance to institutions, as well as performing FERPA-related policy functions and developing guidance. Both units provide training on FERPA's requirements.

After the reorganization, the Privacy Office allocated only two of the five newly authorized positions to the Compliance Office and allocated the remaining three positions to the Policy and Assistance Division. Furthermore, the Compliance Office was authorized to hire only entry-level staff with no prior experience with FERPA, which meant that they would not be able to immediately help reduce or eliminate the complaint backlog in any substantive way.[7]  The Privacy Office also transferred a senior staff member who had previously functioned as the acting director of the Compliance Office to the Policy and Assistance Division as part of the reorganization. The Compliance Office director told us that this individual had played a crucial role within

---

[6] Although the Privacy Office performs a wide range of activities related to its administration of FERPA, the only activity that is explicitly required under FERPA statute is enforcement, including resolving complaints. The Department implemented regulations that state the Privacy Office is also responsible for providing technical assistance.

[7] The Compliance Office director told us that Compliance Office caseworkers need at least 2 years of on-the-job training before they are able to independently resolve FERPA complaints.

the Compliance Office and that her transfer to the Policy and Assistance Division adversely affected the Compliance Office's complaint processing operations and contributed to a growing backlog. Overall, the Privacy Office's staffing decisions after receiving authority to hire five new staff members appear to have done little to improve the Compliance Office's ability to resolve complaints, as the unit lost a highly experienced team member in exchange for two new hires with no FERPA experience.[8]

Although the Privacy Office did not receive all the staff it had requested in its FY 2015 budget request, the five new positions that it did receive represented a substantial infusion of new personnel. It represented a more than 60-percent increase in the number of Federal staff authorized to perform student privacy-related work (the Privacy Office had only 8 Federal staff members working on student privacy in FY 2013 when it submitted its FY 2015 budget request). Because the Privacy Office did not receive all of the personnel it had requested, its leadership faced a critical decision about how to best allocate the available staff to meet organizational needs. The Privacy Office could have first allocated the staff, on a temporary basis, to help address the growing backlog. Once the backlog was eliminated and FERPA complaints were being processed timely, the additional staff could have been reallocated to other Privacy Office activities. The Compliance Office director estimated that the Compliance Office could eliminate the unresolved complaint backlog in about 1 year if it had 5 additional staff with prior FERPA experience or in 2 years with 5 additional staff who did not have FERPA experience. Instead, the Privacy Office's decisions about allocating the new staff provided only limited benefit to the Compliance Office and did not address the backlog.

We recognize that activities carried out by the Policy and Assistance Division represent valuable, proactive measures that may help increase compliance and reduce the volume of FERPA complaints by providing education and technical assistance to schools and other entities that handle student records. Once the backlog has been resolved and the Compliance Office is timely and effectively processing FERPA complaints, the Privacy Office could determine the best way to allocate any available staff. However, considering the substantial backlog that the Compliance Office faced, the Privacy Office should have prioritized its statutory enforcement obligations under FERPA (complaint resolution).

---

[8] The creation of the Policy and Assistance Division reduced the Compliance Office's workload because the Policy and Assistance Division assumed responsibility for some functions previously performed by the Compliance Office. However, the effect of this change on the backlog appeared to be negligible.

## Reasons for the Complaint Backlog and its Consequences

A number of factors have contributed to the FERPA complaint backlog. According to Privacy Office management, the Compliance Office has had a complaint backlog for decades. The Chief Privacy Officer told us that she had seen letters from the 1990s apologizing for 3 to 4 year delays in processing complaints. This inherited historical backlog makes it difficult for the Compliance Office to catch up; even if the Compliance Office is able to resolve as many complaints as it receives each year, the backlog will continue.

The most significant factor contributing to the backlog is that the Compliance Office has not had sufficient resources to adequately address and eliminate the backlog. During FY 2017, the Compliance Office director analyzed how long it takes the Compliance Office to investigate and resolve FERPA complaints and developed a work flow analysis documenting his results. Based on this analysis, he told us that the Compliance Office does not have enough staff to process the volume of incoming complaints on an ongoing basis, let alone address the complaint backlog. The Chief Privacy Officer agreed that the Compliance Office did not have enough resources to reduce or eliminate the backlog. However, Privacy Office management has not prioritized resolving the complaint backlog relative to other FERPA activities such as enhancing technical assistance, developing nonregulatory guidance, or providing training to schools and other entities. Consequently, the Compliance Office's complaint resolution function has been short-staffed and the Privacy Office missed an opportunity to reduce or eliminate the backlog when it received authority to increase staffing for student privacy.

According to Privacy Office officials, unresolved policy issues have also led to delays in complaint resolution that contribute to the backlog, and in some cases, have prevented the Compliance Office from investigating certain complaints. The Compliance Office designated 21 complaints as indefinitely inactive during FY 2017 because of unresolved policy issues. Compliance Office officials identified several areas where the application of FERPA requirements is unclear or has not been resolved. Delays in resolving these issues impedes the Compliance Office's ability to complete, or even conduct, investigations. Officials stated that resolution of these issues has implications beyond resolution of individual complaints and may require statutory or regulatory change or other action by the Department to resolve the underlying policy issues. Privacy Office officials told us there was ongoing dialogue both within the Privacy Office and between the Privacy Office and the Department's Office of General Counsel regarding how certain policy issues and related complaints should be addressed.

The Compliance Office director also told us that complaint volume and complexity have increased in recent years, which has also contributed to the backlog. However, the director could not quantify the increase in complaint volume because of the ineffective tracking system that was in place during the audit period.

Because the complaint backlog still exists, the Privacy Office is not meeting its statutory obligation under 20 U.S. Code Section 1232g(f) and (g) to appropriately enforce FERPA and resolve FERPA complaints. Complainants' privacy rights are also not appropriately protected as FERPA intends. We found that 16 of the 24 complaints in our sample of completed investigations related to the inappropriate disclosure of personal information from students' education records to third parties who should not have had access to the information. The improper disclosures included information related to educational performance, medical records, disciplinary information, and other confidential records. Complainants stated in the sample documentation that the improper disclosures had resulted in harm that included bullying, harassment, retaliation, and loss of employment. Other complainants in our review said they were denied access to their education records. As a result, they were unable to review the records and request the correction of any inaccurate information contained therein. Errors and inaccurate information in a student's official education records may impact the student's eligibility for graduation, postsecondary education, employment, and other opportunities.

Due to the backlog, by the time that the Privacy Office renders a decision on certain complaints, it may be too late to be of use to the students whose rights were violated. Furthermore, schools that have systemic policies or practices that violate FERPA may continue to violate the FERPA rights of additional students for years before the Privacy Office issues a finding and requires corrective actions. For example, one of the open investigations in our sample related to an online charter school with over 8,000 students that required all students to waive their FERPA rights as a condition of enrollment. Despite the significant student privacy ramifications of the school's policy, this complaint was almost 5 years old at the end of FY 2017.[9] Finally, the backlog and ineffective communication with complainants could also result in diminished public trust in the Department.

### No Plan to Address the Backlog

During our fieldwork, the Privacy Office did not have a plan to increase the Compliance Office's resources to address the backlog, despite stating that improving the Compliance Office's operations was a high organizational priority. Privacy Office officials told us that they were considering options to help reduce the backlog, such as obtaining a limited and temporary detail of staff to assist the Compliance Office. However, such measures are not likely to have a significant impact on the backlog. The Chief Privacy Officer identified the Compliance Office's complaint backlog and inadequate complaint tracking process as two of the top four challenges within the Privacy Office. Neither of the other

---

[9] The Compliance Office closed the investigation of this complaint in January 2018.

top challenges was related to the Policy and Assistance Division's operations. She also told us that the primary cause of the complaint backlog was a lack of resources. Despite this, the Privacy Office's budget request for FY 2019 requested four additional positions for the Policy and Assistance Division in FY 2019 compared to three positions for the Compliance Office.[10] Three of the positions that it requested for the Policy and Assistance Division were for experienced personnel while only one of the Compliance Office positions was for experienced personnel. Even though the Privacy Office did not receive any of the positions it had requested for the Compliance Office or the Policy and Assistance Division in its FY 2019 request, the budget request provides insight into the Privacy Office's organizational priorities and how it intended to use additional resources that it might have received.

## Design and Implementation of Complaint Resolution Processes

Although the Compliance Office made improvements to its complaint resolution processes during FY 2017 and into FY 2018, we identified a number of remaining weaknesses. These weaknesses included an inadequate complaint tracking system, lack of controls to ensure effective and timely processing of complaints, and inadequate communication with complainants.

### Complaint Tracking System was Inadequate

The Compliance Office did not have an adequate process for tracking FERPA complaints during the audit period. The Compliance Office could not identify the number of complaints that it had received during each of the last 3 fiscal years (FYs 2015–2017) or the status of those complaints. The Compliance Office also could not identify the total number of complaints that were currently open or the age and status of the open complaints. Complaint tracking is a critical control for ensuring the complaint resolution function is effective and that all investigations are carried out.

### *Complaint Tracking Systems and Processes*

The Compliance Office has used a correspondence tracking system (the correspondence system) to track FERPA complaints since 1997.[11] However, the correspondence system did not have the functionality that the Compliance Office needed to ensure efficient and

---

[10] The additional positions included both new positions and staff to fill existing positions that were vacant.

[11] A Compliance Office official told us that the Department's Office of the Secretary uses the correspondence system to track correspondence. A modified version of the Secretary's correspondence system was developed for the Compliance Office's use.

effective complaint tracking. The correspondence system was designed to track information at the correspondence level rather than the complaint level. During the audit period, the Compliance Office generally opened a new tracking control number for each item of correspondence that it received and closed the control number when it issued correspondence in response. For example, the Compliance Office opened a control number when it received a new complaint and closed that control number when it issued an investigation initiation letter for the complaint. The Compliance Office then opened another control number for the school's response to the investigation initiation letter and closed that control number when it issued a finding letter. In some cases, the Compliance Office opened additional control numbers for follow-up information, status inquiries, and other correspondence related to the complaint. We found that information associated with each investigation was generally stored in the correspondence system using two to five different control numbers, and system users could not always easily locate all correspondence relevant to a given complaint. Additionally, open complaints did not always have an open control number in the correspondence system at any point in time, which created a risk of complaints getting "lost" in the system and not being effectively or timely processed. Finally, the Compliance Office logged all correspondence that it received into the correspondence system even if it was a general inquiry or other information that was not a complaint, so numerous control numbers represented correspondence items that did not involve complaints.

The Compliance Office made changes to its tracking processes in the latter part of FY 2017 and into FY 2018 that helped improve its ability to account for and track complaints. For example, the Compliance Office began to track all open investigations outside of the correspondence system using spreadsheet software. This new tracking process would enable the Compliance Office to identify all open investigations and track them through the resolution process, which it could not do using the correspondence system alone. The Compliance Office also modified the correspondence system to allow it to designate the status of each complaint into a useful category, such as investigating, dismissing, or pending. However, despite these improvements, many tracking weaknesses remain, including the following:

- *No single system to track complaints*. The Compliance Office is now using two separate systems to track complaints (the correspondence system and spreadsheet software) and there are risks associated with the manual entry and updating of the information in both tracking systems.

- *Lack of user-defined querying functionality*. The current tracking systems have significant limitations in how information can be categorized and queried to identify useful subsets of data.

- *Lack of report functionality*. The Compliance Office's ability to generate reports for tracking purposes and to oversee caseworker performance is limited.

- *No ability to automate letters*. The Compliance Office cannot automate the generation of letters, which is a feature that would enable the Compliance Office to efficiently generate updates and other routine correspondence for all complaints that meet selected criteria.

- *No ability to automatically populate the tracking system via smart form linkage*. All data in the tracking systems must be manually entered and updated, which is labor-intensive and creates a risk of data entry errors or omissions.

- *File management limitations and inability to purge obsolete records*. The Compliance Office's ability to manage documentation stored in the correspondence system is limited and it cannot destroy obsolete documentation. Files must be individually marked for deletion by the Compliance Office and then deleted by the correspondence system administrator in the Department's Office of the Secretary.

- *Risk of unintended changes and data loss*. It is relatively easy to inadvertently overwrite information in the tracking systems and the Compliance Office does not have a mechanism to recover data that has been accidentally lost.

### Availability and Use of Operations and Performance Data

Because of the significant limitations of its complaint tracking systems, the Compliance Office did not have access to reliable data regarding the effectiveness and timeliness of its complaint resolution operations. As a result, Privacy Office management had little ability to oversee the performance of the complaint function or trends in the characteristics of incoming FERPA complaints over time. Although the Chief Privacy Officer received a monthly report with information on the volume of work and performance metrics for both the Compliance Office and the Policy and Assistance Division, the metrics that were included for the Compliance Office had little meaning. For example, the report included monthly data on the number of open complaints, but this information actually represented the number of open correspondence control numbers, which does not provide information about the actual number of open complaints. The report also included the number of cases received on a monthly basis, which was also based on the number of control numbers that the Compliance Office had

opened for incoming correspondence rather than the actual number of new incoming complaints.[12]

The Privacy Office did not have the necessary data to set reasonable performance goals for the Compliance Office related to processing and resolving complaints or for caseworkers responsible for handling complaints, or to assess Compliance Office or caseworker performance against those goals. The 2010 consulting report identified this as an area for improvement and included a recommendation that the Compliance Office should establish performance metrics for its key outputs and track its performance against them. The Compliance Office director told us that setting performance standards for the Compliance Office has been challenging given the limitations of available data. At the time of our site visit, the Privacy Office used the average age of open correspondence as a performance standard for the Compliance Office (the goal was to keep the average age under 300 days), but Compliance Office officials acknowledged that this standard does not provide meaningful information. The Compliance Office director told us that he was in the process of gathering data on the Compliance Office's workflows and planned to use the data to establish more meaningful performance metrics. However, until Privacy Office management has access to reliable data on the number of individual complaints that the Compliance Office receives, and the age and status of every complaint, it will not have the data it needs to effectively oversee the Compliance Office's performance.

### Outlook for New Tracking System

The 2010 consulting report on the Compliance Office's operations recommended that the Compliance Office replace the correspondence system with a more effective tracking system and suggested developing a business case to modify the tracking system used by the Department's Office of Civil Rights for the Compliance Office's use. Privacy Office officials told us that they had multiple meetings with the Office of Civil Rights to discuss its tracking system, but abandoned the effort due to a lack of funding and an inability to dedicate staff time to identify and resolve system issues.

The Acting Chief Privacy Officer told us that the Privacy Office requested and was approved for funding for a new complaint tracking system in its FY 2019 budget request. According to the Chief Privacy Officer, the Privacy Office had not previously requested funding for a new tracking system. A new tracking system that has been properly

---

[12] Compliance Office officials told us they made changes to the data included on the internal performance report in FY 2018 that improved the quality of the information and meaningfulness of the report.

designed and implemented could resolve the control weaknesses we observed related to tracking. Compliance Office officials told us that they had developed system specifications and were conducting market research to identify a new tracking system that would have many of the beneficial features that the current correspondence system lacks. The Acting Chief Privacy Officer said she expects to put a new tracking system in place during FY 2019.

### Improperly Classified Complaints as Inactive

In an effort to manage the backlog, the Compliance Office placed some complaints that warranted an investigation, or that might warrant an investigation, into an "inactive" status. While our audit was underway, the Compliance Office reviewed the complaints it had previously made inactive and reactivated or closed most of the complaints. Some complaints remained in an indefinite inactive status because of unresolved policy issues that hampered the Compliance Office's ability to resolve the complaints.

During FY 2017, the Compliance Office reviewed all open correspondence in the correspondence system to determine the appropriate action to take on each item. Compliance Office officials told us there were at least 900 items of open correspondence when they performed this review. The Compliance Office placed more than 170 of these correspondence items into an inactive status. Compliance Office officials told us that they did not plan to take any further action on the inactive items unless the complainants contacted them regarding the status of the complaints. The officials cited several reasons for why they had made these items inactive, including that the associated complaints were very old or vaguely worded.

During our audit fieldwork, Compliance Office officials told us that they had decided to perform a quality check on the inactive items to ensure they were coded properly. The Compliance Office determined that it had incorrectly coded some items as inactive and corrected their status in the correspondence system. After the Compliance Office completed its review of inactive items, we identified the updated status of each formerly inactive item, as shown in Table 2.

**Table 2. Updated Status of Complaints that the Compliance Office Previously Made Inactive**

| Status | Number of Items Now in this Status |
|---|---|
| **Investigating**: The Compliance Office opened an investigation. | 1 |
| **Pending**: The Compliance Office planned to follow up with the complainants to determine whether they still wanted their complaint to be investigated and to obtain additional information, if necessary. | 31 |
| **Inactive**: The Compliance Office determined these complaints appeared to warrant an investigation but remained inactive because they related to unresolved policy questions. | 21 |
| **Dismissed**: The Compliance Office determined that these complaints did not warrant an investigation and planned to issue dismissal notices to the complainants. | 85 |
| **Closed**: The Compliance Office closed these items for a variety of reasons other than dismissal (for example, some were duplicates or general inquiries that were not complaints). | 34 |

The Compliance Office is required to investigate every FERPA complaint that meets the criteria for investigation. Therefore, it is important that the Compliance Office takes timely and appropriate action to process every complaint that it receives. We reviewed the 31 complaints that the Compliance Office previously made inactive and are now in a pending status and determined that all 31 were at least 2 years old, and 8 were at least 3 years old. At a minimum, the Compliance Office should have made the necessary inquiries to determine whether an investigation was warranted at the time that it received the complaints. Additionally, the Compliance Office should not put complaints that meet the criteria for investigation into an indefinite inactive status. If unresolved policy questions interfere with the Compliance Office's ability to investigate complaints, Privacy Office should take action to resolve those policy questions to the fullest extent of its ability.

## Additional Controls over the Complaint Process Needed

The Compliance Office did not have current written policies and procedures for the FERPA complaint resolution process during the audit period. The Compliance Office director told us that the Compliance Office was actively updating and redesigning its complaint resolution processes during the period from FY 2014 through FY 2017. While the redesign of the Compliance Office's operations was underway, the Compliance Office used work flowcharts to identify roles, responsibilities, and processes related to FERPA complaint resolution. The Compliance Office frequently updated the flowcharts to reflect changes to its processes as they developed. The Compliance Office

implemented written policies and procedures for its operations in FY 2018, when it had sufficiently developed its new processes and had staff available with the skillset needed to document the processes in policies and procedures.[13]

Written policies and procedures are an essential component of effective internal control. According to the Green Book, management is responsible for designing policies and procedures to fit the organization's circumstances and incorporating them as an integral part of its operations. An organization's control activities are the actions management establishes through policies and procedures to achieve objectives and respond to risks in the internal control system. Policies and procedures provide staff with guidance that helps to ensure activities are carried out in accordance with legal requirements and also help provide continuity of operations if key personnel leave the organization.

The Compliance Office did not have a consistent process for handling incoming complaints during the audit period, in part because the Compliance Office had not implemented written policies and procedures. Until January 2017 when the Compliance Office implemented weekly triage meetings, the Compliance Office deputy director or team leader performed only a cursory review of incoming complaints before assigning them to individual caseworkers to process as they deemed appropriate. According to Compliance Office officials, each caseworker generally had a caseload of more than 200 complaints, and new complaints generally went to the back of the processing queue. This resulted in variability in the complaint resolution process, delays in issuing correspondence to complainants and the subjects of complaints, and lack of management oversight.

The timing of all activities and correspondence related to each complaint was generally left to the discretion of individual caseworkers. For example, based on our review of the 24 investigations that the Compliance Office completed in FY 2017, the elapsed time from the receipt of the complaint to the issuance of an investigation initiation letter ranged from about 1 month to over 2 years. Although management reviewed outgoing correspondence related to complaints, management did not routinely directly oversee the caseload of each caseworker or always provide input into significant technical decisions, such as how to develop a plan of action for an allegation or whether to investigate or dismiss an individual complaint. Implementing the weekly triage meetings improved both the consistency of complaint processing and management oversight.

---

[13] We did not evaluate the sufficiency of the written policies and procedures nor assess whether Compliance Office personnel were following the policies and procedures because they were not in effect during the audit period.

### *Communication with Complainants Needs to be Improved*

The Compliance Office did not communicate effectively with complainants. Even though most investigations took over 2 years to complete, the Compliance Office did not regularly provide investigation status updates to complainants. Based on the documentation available in the correspondence system for the 24 completed investigations in our sample, it was common for there to be periods of 1 to 2 years during which the Compliance Office provided no information to the complainants about the status of their complaint. The Compliance Office director told us that the Compliance Office wants to institute regular status updates to keep complainants informed of the status of their complaints, but that it has not yet implemented this practice because of inadequate staffing and the correspondence system's inability to generate automated notifications.

The Compliance Office also may not have responded to all inquiries from complainants regarding the status of their complaints. For example, 2 of the complainants in our sample of 24 completed investigations submitted status inquiries to the Compliance Office, and there was no evidence that the Compliance Office had responded to the inquiries. Finally, the Compliance Office did not issue dismissal notifications for all of the complaints that it dismissed during FY 2017. Specifically, as of July 2018 (over 9 months after the end of FY 2017), the Compliance Office had not issued dismissal notifications for 4 dismissed complaints in our sample. After we inquired about these items, Compliance Office officials told us that as a result of their ongoing quality review, the complaints were now designated to receive either a dismissal notification or a pending letter which would enable officials to determine whether the complaint warranted an investigation. However, the Compliance Office had not yet issued the dismissal and pending notifications.

The Compliance Office did not adequately record information about its communication with complainants in its tracking system. When the Compliance Office contacted complainants by email or telephone, it did not always document the details and outcome of those contacts in the correspondence system. As a result, Compliance Office personnel working on a complaint sometimes did not have access to the information that the complainant had already provided to the Compliance Office. Based on our review of sample complaint documentation, some complainants said that the Compliance Office asked them to provide the same information and documentation on multiple occasions.

Complainants in our sample, or their legal representatives, sometimes expressed frustration with the Compliance Office's lack of communication and timely response to their complaints. For example, a legal assistance firm submitted a FERPA complaint on behalf of a client in June 2013. The Compliance Office issued a letter to the complainant's legal counsel about 14 months later to determine whether the

complainant still wished to proceed with the investigation. The complainant's counsel responded that they did. Almost 2 years later, and 3 years after the complaint was originally submitted, the complainant's counsel wrote to the Compliance Office to inform it that they were no longer representing the complainant. The counsel noted that nearly 2 years had passed since the complainant had received any communication from the Compliance Office. Complainant counsel expressed disappointment in the apparent lack of progress in the Compliance Office's investigation and that the Compliance Office had not kept the complainant informed of any progress it had made. Our review determined that the Compliance Office had not yet taken any investigative action on the complaint and that the Compliance Office subsequently dismissed it. Compliance Office officials told us that complainants sometimes contact their Congressional representatives or the Department's Office of the Secretary to express grievances about the Compliance Office's handling of their complaints. The Compliance Office receives letters from Congress inquiring about the status of complaint investigations on a regular basis. The Office of the Secretary also forwards inquiries it has received about complaint investigations to the Compliance Office for resolution.

### Higher Risk Complaints Were not Prioritized

Compliance Office officials told us that the Compliance Office generally processed complaints in the order they were received rather than prioritizing complaints based on risk factors such as potential harm to large numbers of students or the release of personal information. However, officials noted that when they received inquiries from Congress on behalf of complainants, they would immediately provide a response to the inquiry and in certain cases may expedite the investigation of the associated complaint. The Compliance Office received a congressional inquiry regarding 1 of the 24 investigations that it completed during FY 2017. The Compliance Office completed the investigation with the congressional inquiry faster than any of the other investigations it completed that year. In fact, the Compliance Office completed the investigation in just over 1 year, which was about 6 months faster than the next fastest investigation completed during FY 2017.

Compliance Office management has the discretion to establish criteria to enable it to assign a risk score to each complaint and resolve the highest risk complaints first. Complaints vary widely in effect and potential harm to students. For example, one complaint may relate to one student's access to his or her education records, whereas another complaint may relate to a systemic violation of FERPA rights for all students at a school. As noted earlier in the report, one investigation in our sample related to the privacy rights of thousands of students but had been open for nearly 5 years as of the end of FY 2017 despite its significant ramifications. Evaluating each complaint's risk would help the Compliance Office address the Green Book's risk assessment internal

control component, which requires management to identify, analyze, and respond to risks related to achieving its objectives.

After we discussed the prioritization of higher risk investigations with the Compliance Office, the director stated that the Compliance Office plans to develop a risk-based approach to processing complaints. He also noted that the backlog makes prioritizing the resolution of certain complaints more difficult because the Compliance Office is required to investigate every complaint that warrants investigation. According to the director, prioritizing complaints based on risk may be most effective after the Compliance Office has substantially reduced or eliminated the backlog.

## Recommendations

We recommend that the Acting Assistant Secretary of the Office of Management require the Privacy Office to—

1.1 Allocate appropriate resources to the Compliance Office based on the stated priority of reducing or eliminating the investigation backlog so that FERPA complaints are resolved in a timely manner.

1.2 Work with the Office of General Counsel to resolve outstanding policy issues that impede the Compliance Office's ability to investigate certain FERPA complaints.

1.3 Implement an effective FERPA complaint tracking system that allows the Compliance Office to account for and track all complaints it receives, including the status and outcome of each complaint, and that provides an effective mechanism for reliable performance measurement and reporting.

1.4 Use reliable performance data to design and implement appropriate performance standards for the Compliance Office as a whole and for individual personnel responsible for handling complaints.

1.5 Investigate all complaints that meet the criteria requiring investigation and do not place complaints into an "inactive" status.

1.6 Revise processes for resolving FERPA complaints to ensure effective and appropriate communication with the complainant, to include providing dismissal notifications, updates, and responses to inquiries in a timely manner and recording all communication in the tracking system.

1.7 Design and implement a risk-based approach to processing and resolving FERPA complaints, where complaints deemed highest risk are prioritized. Risk can be evaluated based on the subject matter of the complaint, the severity of

risk to student privacy, the number of students affected, or other relevant factors.

1.8 Review and evaluate its current policies and procedures for processing FERPA complaints to ensure they are complete and appropriate.

## Office of Management Comments

The Office of Management agreed with the finding and recommendations and described corrective actions that it had taken or planned to take to address each of the recommendations. The Office of Management provided factual clarifications related to three sentences in the draft report. We removed two of the sentences because they were not essential to the report's finding, conclusions, or recommendations. We did not make any changes to the third sentence because it was correct as stated. The Office of Management also stated that it could be perceived that the draft report included material covered by attorney-client or deliberative process privileges. Where warranted, we made additional revisions to the report in response to these comments. These revisions included technical and clarifying edits, as well as changes to resolve concerns about possible privileged material being discussed in this report. None of the revisions resulted in changes to our finding, conclusions, or recommendations.

## Other Matter. The Privacy Office Should Conduct Self-Initiated Investigations When Warranted

Under 20 U.S. Code Section 1232g(f), the Department is required to take appropriate actions to enforce FERPA, and in 2008, the Department amended the FERPA regulations at 34 C.F.R. Section 99.64(b) to clarify that the Department's enforcement responsibilities include the authority to conduct self-initiated investigations of possible FERPA violations. A "self-initiated investigation" is any investigation that the Compliance Office undertakes of its own initiative when no complaint has been filed or when a complaint is withdrawn but raises concern about FERPA compliance at an institution. The Privacy Office stated in its FY 2015 budget request and its FY 2016 reorganization memorandum that it planned to begin conducting self-initiated investigations. However, at the time of our on-site work, the Compliance Office had not yet begun any self-initiated investigations.

Conducting self-initiated investigations could be an important part of the Privacy Office's statutory responsibility to enforce FERPA. This is especially important when the Compliance Office learns of potential FERPA violations affecting large numbers of students, such as a school sharing students' personal information with a third-party vendor that does not have a legitimate educational need for the information. In cases such as this, parents and eligible students may not file any complaints because they are not aware of the school's practices or do not understand that a violation has occurred. However, the Compliance Office has a responsibility to take action in the absence of a complaint.

In May of 2018, the Compliance Office director told us that the Compliance Office had recently begun its first self-initiated investigation in response to a high-profile incident that gave the Compliance Office reasonable cause to suspect that a FERPA violation may have occurred. He also said that the Compliance Office intends to conduct self-initiated investigations when feasible and necessary, despite its current staffing limitations. The Compliance Office should continue conducting self-initiated investigations as practicable with currently available resources and consider placing greater emphasis on self-initiated investigations once the backlog is reduced or eliminated.

## Appendix A. Scope and Methodology

The original objective of our audit was to determine whether the Privacy Office effectively oversees and enforces compliance with selected provisions of FERPA and the Protection of Pupil Rights Amendment. After performing initial audit work, we revised the objective to focus on the Privacy Office's processing of FERPA complaints. The audit covered the Privacy Office's processing of FERPA complaints that were open for at least one day during FY 2017, regardless of when the Privacy Office originally received the complaints. "Processing" of FERPA complaints refers to all actions that the Privacy Office has taken related to the complaints, including receiving, recording, reviewing, tracking, dismissing, investigating, and closing the complaints. We limited our scope to the complaint-processing activities that the Privacy Office performed from the time it received the complaints through the end of FY 2017. We also obtained information about changes that the Privacy Office made to its complaint processes during FY 2018 while the audit was underway. However, we did not verify the completion, implementation, or effectiveness of these changes.

We performed the following procedures to answer the audit objective:

1. Reviewed applicable sections of the FERPA statute and regulations (20 U.S. Code Section 1232g and 34 C.F.R. Part 99) to gain an understanding of FERPA's student privacy rights, the FERPA complaint process, and the Department's responsibilities under FERPA.

2. Reviewed background materials, including the Privacy Office's organizational charts, functional statements of Privacy Office divisions, and any available reports on the Privacy Office's FERPA complaint-processing function. There were no prior Office of Inspector General or U.S. Government Accountability Office reports in this area, but we did review a 2010 consulting report on the Compliance Office's operations commissioned by the Department.

3. Interviewed Privacy Office officials including the Chief Privacy Officer, the director and deputy director of the Compliance Office, the director of the Policy and Assistance Division, and other relevant personnel to gain an understanding of the Privacy Office's processing of FERPA complaints and other Privacy Office activities related to the oversight and administration of FERPA. We also observed Compliance Office complaint triage meetings in September and November of 2017.

4. Obtained and reviewed documentation to gain an understanding of the processes, systems, activities, and circumstances that were relevant to the Privacy Office's oversight and administration of FERPA. We reviewed the Privacy Office's budget requests, strategic plans, reorganization memorandums, and

staffing information; policies and procedures for the Compliance Office and the Policy and Assistance Division's operations; performance standards and reports for the Compliance Office and the Policy and Assistance Division; the Compliance Office's work and resource analysis and complaint tracking files; and other relevant documentation.

5.  Obtained user access to the correspondence system to gain a first-hand understanding of the system's capabilities and limitations and to obtain copies of complaint records for testing.

6.  Selected a sample of 74 FERPA complaints for detailed review (see "Sampling Methodology" section below).

7.  Obtained and reviewed documentation for each of the 74 sampled complaints to gain a detailed understanding of the circumstances and timeframes of activity associated with each complaint.[14] Depending on the complaint's stage in the resolution process, available documentation could include the original complaint, the Compliance Office's investigation initiation letter to the complainant and school, the school's response to the investigation initiation letter, the Compliance Office's finding and closure letters, as well as follow-up and communication between the Compliance Office and the complainant or other relevant parties.

8.  Analyzed the results of our review of the 74 sampled complaints to draw conclusions regarding complaint resolution processes and timeframes for the sample.

9.  Reviewed the Green Book, September 2014, and used it as a framework for evaluating the design and implementation of the Privacy Office's controls that were significant to the audit objective. We assessed the collective testimonial, documentary, and direct observational evidence and used the information to evaluate the Privacy Office's internal control over the processing of FERPA complaints.

─────────────────────

[14] Our review of the sampled complaints was limited to the Compliance Office's processing of each complaint and did not include an evaluation of the Compliance Office's technical conclusions. For example, we did not evaluate the Compliance Office's decision to investigate or dismiss a given complaint or assess the Compliance Office's findings on FERPA compliance in the sample of completed investigations. We did evaluate the Compliance Office's processes to determine whether the Compliance Office had controls, such as supervisory reviews, over the accuracy of its technical conclusions.

## Sampling Methodology

The weaknesses in the Compliance Office's FERPA complaint tracking processes and related data prevented us from identifying the population of all FERPA complaints. As a result, we could not draw statistical samples and project our results to the population of all complaints. Instead, we used judgmental sampling to select complaints for testing. The results of our review are therefore limited to the items tested.

We worked within the known limitations of the Compliance Office's complaint tracking data to identify four populations of FERPA complaints for judgmental sampling purposes: (1) completed investigations, (2) open investigations, (3) inactive complaints, and (4) dismissed complaints. We used the most reliable source of data available to identify each sample for testing (that is, the correspondence system, the tracking spreadsheet, or both). We performed appropriate steps to identify each population, which included querying the correspondence system, generating reports of the search results, combining multiple reports, and manually evaluating the results, as well as reviewing and sorting the entries in the tracking spreadsheet.

The populations that we identified had reliability issues that included a lack of completeness and accuracy (the populations may exclude complaints that belong or include complaints that do not belong). However, we determined that the populations were sufficiently reliable for our intended use.

We selected 24 completed investigations, 20 open investigations, 20 inactive control numbers, and 10 dismissed complaints for review using a combination of random and risk-based judgmental selection processes as detailed below. We considered various factors when determining the appropriate sample size to draw from each population, including the size of each population and the significance of each population to the overall sampling objective.

- *Completed investigations*. We identified a population of 24 FERPA complaint investigations that the Compliance Office completed during FY 2017 and reviewed all 24 of the investigations.

- *Open investigations*. We identified a population of 285 FERPA complaint investigations that were open on September 30, 2017 (the last day of FY 2017). We selected a systematic sample of 20 investigations by first sorting the population in chronological order and then selecting every 14th item.

- *Inactive complaints*. We identified a population of 172 correspondence control numbers that the Compliance Office had made inactive during FY 2017. We selected a sample of 20 inactive control numbers from the population using 2 separate methodologies.

o   First, we determined that the Compliance Office had assigned an investigation number to 15 of the 172 inactive control numbers at some time before making them inactive. We then reviewed information available in the correspondence system and on the tracking spreadsheet and made a risk-based judgmental selection of 10 of the 15 items that had an investigation number.

o   Second, we systematically selected another 10 items by first sorting the remaining population of 162 inactive control numbers in chronological order and then selecting every 16th item.

- *Dismissed complaints.* We identified a population of 110 complaints that the Compliance Office had dismissed during FY 2017 because the complaints did not meet the criteria to warrant an investigation. We selected a systematic sample of 10 complaints by first sorting the population in chronological order and then selecting every 11th item.

After we began the sample testing, we observed that a limited number of the sample items we had selected for review did not meet the criteria to be included in the sample (for example, we found that some items in the sample of dismissed complaints were not actually dismissals). This was a result of the known reliability limitations of the populations from which we drew our samples. In these cases, we replaced the items that did not belong in the sample with the next item in the population that met the criteria to be included in the sample.

## Use of Computer-Processed Data

The only computer-processed data that were significant to the audit objective were data related to the Compliance Office's tracking of FERPA complaints. As discussed earlier in this report, the tracking processes that the Compliance Office used for FERPA complaints had significant weaknesses and reliability issues. Since the Compliance Office did not have reliable tracking data on complaints, we did not use the computer-processed tracking data to support our finding or conclusions related to the sample complaints we reviewed. Our only uses of the computer-processed data were to help identify complaints for detailed testing (see "Sampling Methodology" section above) and to perform a limited comparison of the 2017 and 2018 versions of the tracking spreadsheet to assess the reasonableness of the Compliance Office's estimate that it had a 2-year backlog (as described in the "Unresolved Complaint Backlog" section). Although the tracking spreadsheet had known reliability issues, it provided the best and only data available to evaluate the Compliance Office's estimate. We deemed the spreadsheet to be sufficiently reliable for the limited purpose of this comparison. We derived the results of the sample testing from the manual evaluation of source documentation for each complaint, and consequently the results were not affected by

the reliability of the computer-processed complaint tracking data. The reliability concerns related to the computer-processed tracking data prevented us from drawing a statistical sample and projecting our testing results to the population of all complaints, but it did not affect the reliability of the results for the items we tested. We did not perform a reliability assessment for the Compliance Office's computer-processed data because we did not use the data to support our audit results, except as described above.

We held our entrance conference and performed initial audit work at the Privacy Office's office in Washington, D.C., in September 2017. We held a separate meeting to inform Privacy Office officials of changes to our audit objective and audit scope when we conducted additional on-site work in November 2017. We held an exit conference to discuss the audit results with Privacy Office officials in June 2018.

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective. We believe that the evidence obtained provides a reasonable basis for our finding and conclusions based on our audit objective.

## Appendix B. Acronyms and Abbreviations

| | |
|---|---|
| C.F.R. | Code of Federal Regulations |
| Compliance Office | Privacy Office's Family Policy Compliance Office |
| correspondence system | Compliance Office's correspondence tracking system |
| Department | U.S. Department of Education |
| FERPA | Family Educational Rights and Privacy Act |
| FY | fiscal year |
| Green Book | U.S. Government Accountability Office's "Standards for Internal Control in the Federal Government" |
| Policy and Assistance Division | Privacy Office's Student Privacy Policy and Assistance Division |
| Privacy Office | Office of the Chief Privacy Officer |

## Office of Management Comments



**UNITED STATES DEPARTMENT OF EDUCATION**

**OFFICE OF MANAGEMENT**

Oct 17 2018

TO:        Mr. Ray Hendren
                    Regional Inspector General for Audit
                    Office of Inspector General

FROM:      Denise L. Carter /s/
                    Acting Assistant Secretary
                    Office of Management

SUBJECT:   Response to Draft Audit Report *Office of the Chief Privacy Officer's Processing of Family Educational Rights and Privacy Act Complaints* Control No. ED-OIG-A09R0008

Thank you for providing the U.S. Department of Education (Department) Office of Management (OM) the opportunity to review and comment on the September 18, 2018, draft report, titled *Office of the Chief Privacy Officer's Processing of Family Educational Rights and Privacy Act Complaints* (ED-OIG-A09R0008).  OM appreciates the extensive work that went into the draft report and professional and cooperative manner demonstrated by the audit team when working with the Office of the Chief Privacy Officer's (Privacy Office's) staff throughout the audit process.

We have reviewed the draft report and generally concur with the finding, and its subcomponents regarding the Department's processing of complaints under the Family Educational Rights and Privacy Act or FERPA.  OM is taking appropriate actions to ensure that the Department's Family Policy Compliance Office (Compliance Office or FPCO), which is responsible for implementing FERPA, has the resources and mechanisms available to meet its legal obligations under FERPA.

In this response to the draft report, OM makes a few factual clarifications, and provides responses, with implementation updates, to the specific recommendations included in the draft report.

38

**Factual Clarifications**

1. On page 9, the draft report describes the Privacy Technical Assistance Center (PTAC) as "*a contractor that functions as a unit within the Policy and Assistance Division.*" This is incorrect, as the Department "in-housed" PTAC operations in fiscal year (FY) 2015. While PTAC is supported by contractor staff, PTAC's technical assistance operations are conducted by a combined team of Student Privacy Policy and Assistance Division's (SPPAD) federal employees and contractor subject matter experts.

2. On resource allocation to SPPAD, the draft report states, on page 16, that "*…two of the three new positions allocated to the Policy and Assistance Division were for experienced senior-level staff. The Privacy Office also transferred a senior staff member who had previously functioned as the acting director of the Compliance Office to the Policy and Assistance Division as part of the reorganization.*" This is incorrect. SPPAD only received one new, senior-level staff member (i.e. the GS-15 director) out of the five newly-authorized positions. The remaining two new positions were both for junior-level hires. Furthermore, the senior staff member transferred from the Compliance Office to SPPAD was thereafter detailed back to the Compliance Office on a part-time basis to continue assisting with complaint processing.

**Response to Recommendations**

**RECOMMENDATION 1.1**: *Allocate appropriate resources to the Compliance Office based on the stated priority of reducing or eliminating the investigation backlog so that FERPA complaints are resolved in a timely manner.*

**RESPONSE (1.1)**: OM concurs that appropriate resources should be allocated to the Compliance Office to reduce or eliminate the investigation backlog and to ensure that all complaints are processed in a timely and effective manner. You state that OM had the opportunity to eliminate or reduce the complaint backlog when it received authority to hire five additional staff for FERPA-related activities in FY 2015; that the Privacy Office dedicated the majority of the new staff it obtained to performing FERPA work unrelated to the resolution of existing complaints (such as technical assistance, training, and guidance); and that the Privacy Office should have focused its resources on its legal obligation to investigate and resolve complaints.

Since the conclusion of the audit, OM has implemented changes to address these concerns and to improve its compliance activities. In September 2018, responsibility for responding to technical assistance inquiries from parents and students was transferred from Compliance Office staff to the contractors supporting the Privacy Technical Assistance Center, enabling case-workers to focus exclusively on complaint processing. Additionally, in September 2018, federal staff from the Policy and Assistance Division were indefinitely assigned to assist with the processing of FERPA complaints. In October 2018, the director of the Compliance Office was detailed to the separate Office of Planning, Evaluation, and Policy Development within the Department and the director of the Policy and Assistance Division, a certified Project Management Professional with extensive FERPA expertise, was made acting director of the Compliance Office. Also in October 2018, a senior data analyst was permanently reassigned to the Compliance Office from the OM Executive Office, to provide needed data analysis and performance management support. OM continues to evaluate additional resource needs on an ongoing basis to

determine if additional staff or skill-sets are required.  Together, these staffing changes will enable the Compliance Office to reduce (and ultimately eliminate) the complaint backlog.

**RECOMMENDATION 1.2:** *Work with the Office of General Counsel to resolve outstanding policy issues that impede the Compliance Office's ability to investigate certain FERPA complaints.*

**RESPONSE (1.2):**  OM notes that a small percentage of complaints raise issues that require the interpretation and clarification of complex legal and policy issues that the Department has yet to address and which would have broad implications far beyond the individual complaint. These unresolved policy issues have in some cases made it difficult for the Compliance Office to complete the review and investigation of these complaints.

With respect to addressing those policy issues that are raised by complaints, OM agrees that it will actively work with senior Department leadership and OGC to determine how best to clarify legal and policy issues needed to ensure that complaints are resolved in a timely manner, recognizing that some issues may require issuance of other documents.

Additionally, in support of this recommendation, we note some of the statements in the draft report could be perceived as waiving attorney-client and deliberative process privileges, which the Department is not waiving.  Some of these points are also not fully accurate, and should be deleted.  OGC will provide separately comments on this section as well.

**RECOMMENDATION 1.3:** *Implement an effective FERPA complaint tracking system that allows the Compliance Office to account for and track all complaints it receives, including the status and outcome of each complaint, and that provides an effective mechanism for reliable performance measurement and reporting.*

**RESPONSE (1.3):**  OM concurs that the Compliance Office must have an effective complaint tracking system that allows it to account for and track all complaints it receives, including the status and outcome of each complaint, and to provide the Compliance Office and the Department with reliable performance measurement and reporting.  As the report notes, the Compliance Office has used a correspondence tracking system to track FERPA complaints since 1997.  The system does not have the functionality that the Compliance Office needs to ensure efficient and effective complaint tracking.  The report acknowledges that the Compliance Office made changes to its tracking processes in the latter part of FY 2017 and into FY 2018 that helped improve its ability to account for and track complaints.

OM is currently taking action to rectify this deficiency, and anticipates identifying and implementing a new technical solution in FY 2019 that will meet FPCO complaint processing information management requirements.

As an interim measure, OM has improved the functionality of the existing systems by integrating both ccmMercury and the Complaint Tracker into the Microsoft Business Intelligence platform through data application programming interfaces (APIs), to enable integrated, on-demand performance tracking of cases and complaints across both systems.

**RECOMMENDATION 1.4:** *Use reliable performance data to design and implement appropriate performance standards for the Compliance Office as a whole and for individual personnel responsible for handling complaints.*

**RESPONSE (1.4):** OM agrees that having reliable and meaningful performance data to design and implement appropriate performance standards for the Compliance Office as a whole and for individual personnel responsible for handling complaints is necessary. Effective FY 2019, the Privacy Office will begin using data from a newly-developed dashboard prepared by the Performance Improvement Office within the Office of the Deputy Secretary.  This data and dashboard will be used by the Compliance Office director to establish meaningful performance measures for the office and staff.

**RECOMMENDATION 1.5:** *Investigate all complaints that meet the criteria requiring investigation and do not place complaints into an "inactive" status.*

**RESPONSE (1.5):** OM agrees that coding complaints as "inactive" is not an effective or appropriate way of coding complaints.  The Compliance Office no longer places complaints into "inactive" status and has already re-coded those complaints related to unresolved policy issues to indicate they are in need of policy determinations and these are currently being addressed, through consultation with senior Department leadership and OGC, as described in our response to recommendation 1.2.

**RECOMMENDATION 1.6:** *Revise processes for resolving FERPA complaints to ensure effective and appropriate communication with the complainant, to include providing dismissal notifications, updates, and responses to inquiries in a timely manner, and recording all communication in the tracking system.*

**RESPONSE (1.6):** OM agrees that the Compliance Office should revise its policy and procedures to ensure effective and appropriate communication with complainants, including dismissal notifications, updates, and response to inquiries in a timely manner and recording all communications in the tracking system.  The Compliance Office has taken multiple steps to address this recommendation as described below:

- Initiated an intake team process with responsibility to:  (1) log all new complaints and correspondence received from complainants; (2) appropriately prepare incoming documents for further review by Department staff; (3) triage all complaints to determine how complaints will be handled; and (4) either draft letters that dismiss complaints for cause, request further clarification from complainants, or open formal investigations.  If opening a formal investigation, the intake team drafts a letter to send to the educational agency or institution to initiate the investigation and to obtain facts from the educational agency or institution regarding the alleged violation(s).  This process change has resulted in earlier notifications to complainants on the status of their complaints.

- Updated and expanded our standard language for notifying complainants of receipt of complaints or correspondence and developed a process for automating this process.

- Expanded our bank of dismissal templates to 58, which has resulted in the drafting of dismissal letters more expeditiously.  This has reduced the amount of time required to process dismissal letters, and streamlined the overall review and processing of such letters.  As a result of these actions, the Compliance Office has issued all of the dismissal letters for those complaints designated for dismissal that were open during the period of the audit.

41

- Established template letters for initiating investigations which has expedited letter drafting by the intake team, and allocated additional resource time to perform quality review.  As a result, the Compliance Office expects to issue over 200 additional investigation initiation letters by the end of October.

- Formed a customer service work team in early 2018 that is developing standard operating procedures and the tools necessary to communicate with complainants in a timely and customer friendly manner.  The work team submitted proposed amendments to the FPCO SOPs in September 2018 and FPCO anticipates finalization of these new procedures by December 2018.

- Included in the specifications for the new complaint tracking system are requirements that complainants will be able to check the status of their complaints online.  The system will also facilitate communication by allowing for the automation of issuance of letters.  This will be completed during FY2019.

**RECOMMENDATION 1.7:**  *Design and implement a risk-based approach to processing and resolving FERPA complaints, where complaints deemed highest risk are prioritized. Risk can be evaluated based on the subject matter of the complaint, the severity of risk to student privacy, the number of students affected, or other relevant factors.*

**RESPONSE (1.7):**  OM agrees that a risk-based approach to processing and resolving FERPA complaints should be designed and implemented.  Efforts are currently underway to prioritize complaints (using a risk analysis) according to their severity, the sensitivity of the records involved, their likelihood of impacting a large number of individuals, and other relevant factors.

**RECOMMENDATION 1.8**:  *Review and evaluate its current policies and procedures for processing FERPA complaints to ensure they are complete and appropriate.*

**RESPONSE (1.8):**  OM agrees that having SOPs that are complete and appropriate are critical to having a well-functioning operation with effective internal controls.  As noted in the draft report, beginning in FY 2017 the Compliance Office began a significant redesign and overhaul of its complaint resolution processes. The Compliance Office explained to the audit team that as part of this initiative, the Compliance Office reviewed the backlog of all open complaints to determine the appropriate action for each complaint, modified and improved its complaint tracking processes, developed standard templates for letters it commonly issued during complaint resolution, and developed written policies and procedures.  Although the Compliance Office provided the audit team a copy of recently developed written policies and procedures, auditors did not consider them as they were not fully implemented during the period of the audit.

While the Compliance Office did have written policies and procedures prior to the most recent policies and procedures, the Compliance Office management found them not to be effective or consistent with their vision to modernize operations in a way that maximized the office's resources.  The Compliance Office relayed to the audit team that, in FY 2014, the Compliance Office management team began the systematic process of working with staff to develop new operating procedures that maximize available resources and technology, improve workflow efficiency, and enhance internal controls.  The draft report noted that the Compliance Office was utilizing flow charts as its written procedures.  As the Compliance

Office director explained during the exit conference and in written response, the flow charts were not static documents, but were an integral part of their strategy to test procedures and revise processes as the staff identified more efficient ways to do the work.  The Compliance Office provided the audit team a chronology of flow charts demonstrating this on-going process and how the staff continually performed analysis for effectiveness and made improvements to its procedures.  The Compliance Office was then able to complete new written policies and procedures to reflect the procedures included in its early 2017 flow charts.  Although the Compliance Office did not have a final written version of its new SOPs during the audit period, it had begun implementing changes to its procedures during the period of the audit. The procedures were predicated upon its workflow diagram and "draft" SOPs.  Further, as part of its ongoing improvement strategies, the Compliance Office formulated a SOP working team in early 2018 consisting of representatives of the intake staff, caseworkers, and management team that meet on a monthly basis to review the Compliance Office's policies and procedures, assess their efficacy, and recommend or make changes to their processes.  During the Compliance Office's September 2018 retreat, employees were presented with the new updated written SOPs for review and discussion.  The Compliance Office will continue the practice of a monthly meeting of the SOP working team and continue to identify and make appropriate changes to its policies and procedures as necessary. Furthermore, in October 2018, the new acting director and deputy director of the Compliance Office have made additional process changes to streamline the review and processing of complaints that will be reflected in the SOPs, and are committed to identifying and implementing additional process improvements on an ongoing basis over the coming months.

**Other Matter:**  *The Privacy Office should conduct self-initiated investigations when warranted.*

**RESPONSE**:  OM agrees that the Compliance Office should conduct self-initiated investigations when warranted.  As you note in your report, the Department amended the FERPA regulations in 2008 to clarify that the Department's enforcement responsibilities include the authority to conduct self-initiated investigations of possible FERPA violations.  The Compliance Office agrees that self-initiating investigations could be an important part of its statutory responsibility to enforce FERPA.  As noted by the OIG in the draft report, the Compliance Office director reported that the Compliance Office had recently initiated its first self-initiated investigation and intends to conduct self-initiated investigations in the future when warranted.  The Compliance Office is optimistic that as process improvements are implemented (including those discussed in our response to Recommendation 1.7), it will conduct more self-initiated investigations.  OM will work with the Compliance Office to set criteria for self-initiating investigations of violations of FERPA.